CARNATION COMPANY, a corporation, Appellant,

v.

PACIFIC WESTBOUND CONFERENCE, Far East Conference and the Federal Maritime Commission, et al., Appellees.

No. 18926.

United States Court of Appeals Ninth Circuit.

July 30, 1964.

Rehearing Denied Sept. 28, 1964.

Arthur B. Dunne, Wallace R. Peck, San Francisco, Cal., James R. Baird, Jr., William H. Birnie, Los Angeles, Cal., Dunne, Bledsoe, Smith, Phelps, Cathcart & Johnson, San Francisco, Cal., for appellant.

Herman Goldman, Elkan Turk, Jr., Sol. D. Bromberg, New York City, for appellees Far East Conference and members and former members thereof.

Edward D. Ransom, William H. King, Lillick, Geary, Wheat, Adams & Charles, San Francisco, Cal., for appellees Pacific Westbound Conference and others.

James L. Pimper, Gen. Counsel, Robert E. Mitchell, Deputy Gen. Counsel, Robert B. Hood, Jr., and John E. Cograve, Attys., Federal Maritime Commission, Washington, D. C., for appellee Federal Maritime Commission.

Before CHAMBERS, POPE and JERTBERG, Circuit Judges.

POPE, Circuit Judge.

On December 5, 1962, the appellant Carnation Company filed in the court below its complaint against Pacific Westbound Conference and Far East Conference, and numerous individual shipping lines, members of those conferences, seeking recovery of treble damages under the antitrust acts [1] on account of damages claimed to have been suffered by Carnation through an alleged unlawful combination fixing prices and rates for shipment of Carnation's manufactured products to the Philippine Islands, pursuant to agreements among them which had not been filed with or approved by the Federal Maritime Commission.[2]

This appeal is from an order dismissing the action on the ground that the matters complained of were within the primary jurisdiction of the Commission.

Each of the defendant conferences had on file with the Maritime Commission an approved agreement of the kind referred to in Sec. 15 of the Shipping Act. Pacific Westbound Conference's approved agreement known as No. 57, was designed, among other things, to carry out the purpose of that Conference to fix the rates at which conference members would serve shippers in foreign commerce westbound from Pacific Coast ports. The Far East Conference had a similar approved agreement designated as No. 17 on the records of the Commission. In addition, the members of the two conferences had another agreement providing for joint fixing of rates by both conferences, known as No. 8200, which was approved on December 29, 1952. The burden of the complaint of Carnation is that a certain increased rate fixed and put into effect, relating to plaintiff's product and its rates for shipping over the routes traversed by the members of the Pacific Westbound Conference, was established between the members of both conferences, not pursuant to Agreement No. 57, nor pursuant to Agreement No. 8200, the approved agreements, but pursuant to another agreement which was not presented to or approved by the Commission. Accordingly, it is said the fixing of that rate was a per se violation of the Sherman Act. This forms the basis for Carnation's claim for treble damages.

Prior to the institution of the present action, on October 26, 1959, the Federal

1. Jurisdiction was invoked under Sections 1 and 2 of the Sherman Act (26 Stat. 209, 15 U.S.C. Secs. 1 and 2), Section 4 of the Clayton Act (38 Stat. 731, 15 U.S.C. Sec. 15) and Secs. 1331 and 1337 of Title 28, U.S.C.

2. Sec. 15 of the Shipping Act, 1916, (46 U.S.C. Sec. 814) as it read on the dates involved in this action, provided that common carriers by water shall file with the Commission a copy of every agreement with another carrier fixing or regulating transportation rates or fares controlling or regulating competition, or providing for an exclusive preferential or co-operating working arrangement; Commission was authorized to disapprove any such agreement which it found to be unjustly discriminatory or unfair or otherwise in violation of the Act but it was required to approve all other agreements; and it provided that "[e]very agreement * * * lawful under this section shall be excepted from the provisions of sections 1–11 and 15 of Title 15, and amendments and Acts supplementary thereto."

Maritime Board, predecessor agency to the Federal Maritime Commission,[3] ordered an investigatory proceeding entitled "No. 872, Agreement No. 8200— Joint Agreement Between the Member Lines of the Far East Conference and the Member Lines of the Pacific Westbound Conference" instituted pursuant to Sections 15, 16, 17 and 22[4] of the Shipping Act. The order directed that the Board "enter upon an investigation and hearing to determine whether said Agreement No. 8200 is a true and complete agreement of the parties within the meaning of said Sec. 15, and whether it is being carried out in a manner which makes it unjustly discriminatory or unfair," etc.

The Carnation Company on September 3, 1960, petitioned the Board for leave to intervene in that proceeding, and on September 8, following, leave so to intervene was granted.[5]

Hearing was had in this matter before an examiner and extensive sessions were held in San Francisco, New Orleans and Washington. The examiner filed an initial decision on August 30, 1963, which is reported in 2 Pike & Fischer, Ship. Reg.Rep. 900. The issues presented at this hearing by Carnation and others included in general the same matters and claims set forth in Carnation's complaint in this case.

That complaint alleges that in January, 1953, defendants met at Santa Barbara, California, and then and there secretly conspired and agreed to fix rates for transportation of commodities by members of the Pacific Westbound Conference from Pacific Coast ports of the United States to the Far East "not as provided in said Agreement No. 57 and not as provided in said Agreement No. 8200", and thereafter met and secretly renewed said association and agreement and agreed as follows: (a) Neither Conference nor any member thereof "should disclose to any shipper information regarding rate changes and/or the position of either Conference or of any member of either Conference regarding rate requests;" (b) Both Conferences would fix and agree upon the rates for transportation of commodities by water by members of Pacific Westbound Conference in trade from Pacific Coast ports to the Far East including the Philippine Islands; and that the rate so fixed should be given out by Pacific West Coast "falsely pretending to act as such and under said Agreement No. 57;" (c) Pacific Westbound Conference, contrary to the provisions of Agreement 57 and Agreement 8200 would make no change in any rate established by it or fixed as aforesaid, without the concurrence of the Far East Conference with the exception of the commodities placed on a "list of initia-

---

3. When the Shipping Act of 1916 was passed it vested its administration in the United States Shipping Board. By a succession of Executive Orders this board was succeeded first by the United States Maritime Commission, then by the Federal Maritime Board, and finally by the present Federal Maritime Commission.

4. 46 U.S.C.A. Sec. 821: "Complaints to Board and investigations. Any person may file with the Federal Maritime Board a sworn complaint setting forth any violation of this chapter by a common carrier by water, or other person subject to this chapter, and asking reparation for the injury, if any, caused thereby. The Board shall furnish a copy of the complaint to such carrier or other person, who shall, within a reasonable time specified by the Board,

satisfy the complaint or answer it in writing. If the complaint is not satisfied the Board shall, except as otherwise provided in this chapter, investigate it in such manner and by such means, and make such order as it deems proper. The Board, if the complaint is filed within two years after the cause of action accrued, may direct the payment, on or before a day named, of full reparation to the complainant for the injury caused by such violation.

"The Board, upon its own motion, may in like manner and, except as to orders for the payment of money, with the same powers, investigate any violation of this chapter."

5. Other parties, including some Pacific Coast ports, also intervened, on grounds not material here.

"tive items", which did not include condensed or evaporated milk; that rates for evaporated milk were agreed upon and issued. The complaint further states that the Conferences and their members, acting pursuant to the agreement alleged, agreed to increase rates on evaporated milk from the United States to the Philippine Islands by $2.50 per ton, purportedly pursuant to the provisions of Agreement No. 57, and these rates were put into effect over the plaintiff's protest; that this was done pursuant to the above described secret agreement which was never submitted to the Commission and that carrying it out was an unlawful combination and conspiracy in restraint of trade.

It was alleged further that in November, 1957, plaintiffs requested Pacific Westbound Conference to reduce such rate by $2.50 per ton to the rate previously established; that the Pacific Westbound Conference was willing to grant that request subject to the concurrence of the Far East Conference; that the defendant Far East Conference declined to grant such concurrence; that in advising plaintiff of its denial of the request for reduction Pacific Westbound Conference represented that the members of that Conference, after long and careful study, though initially disposed to grant a reduction, denied the same; that this statement was false in that the request for reduction was in fact declined by reason of Far East Conference's refusal to concur in the reduction; and that plaintiff did not learn of these matters until disclosure thereof was made in May, 1961, in the course of the proceedings before the Commission which is described above.

■ It thus appears that prior to and at the time of the institution of this action the Commission had under investigation substantially the same question as that sought to be raised by the complaint filed under the antitrust laws. The Federal Maritime Commission was granted leave to intervene in this action in the court below. Intervener and all defendants moved to dismiss the action on the ground that the Shipping Act provided the exclusive remedy for the wrongs alleged in the complaint, and that the court was without jurisdiction to proceed.[6] The motion to dismiss was granted.

In dismissing the action, the court below relied upon the decisions in the cases of United States Nav. Co. v. Cunard Steamship Co., 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408, and Far East Conf. v. United States, 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576. It seems plain to us that both of these decisions support and require the action of the court below.

In Cunard the action was brought by the Navigation Company to enjoin the respondent steamship companies from continuing an alleged combination and conspiracy in violation of the Sherman Act and the Clayton Act. The trial court there granted a motion to dismiss on the ground that the matters complained of were within the exclusive jurisdiction of the United States Shipping Board under the Shipping Act of 1916. The bill there alleged that the defendant corporations were engaged in carrying 95 percent of

6. The motion asserted that the acts alleged in the complaint constituted charges of violations of provisions of the Shipping Act which, to the extent of such acts and charges, supersedes the antitrust laws, and that the remedy for such charges was that afforded by the Shipping Act; that the Court is without jurisdiction of the subject matter; that the practices adopted by the carrier in connection with the rates established by them are within the exclusive jurisdiction of the Federal Maritime Commis-

sion, which is authorized to afford complete remedy with respect thereto. Attention was called to the proceeding then pending before the Maritime Commission in which substantially the same issues as those tendered by the complaint would be decided by the Commission. In support of its motion to dismiss, the Maritime Commission filed an affidavit by its Secretary setting forth portions of the record of its docket No. 872 previously mentioned.

the cargo trade from Atlantic ports of the United States to the ports of Great Britain and Ireland and those defendants and the plaintiff were the only lines maintaining general cargo services in that trade. It was charged that the defendants had entered into a combination and conspiracy to restrain the foreign trade and commerce of the United States in respect to carriage of cargo over the routes mentioned and with the object and purpose of driving the petitioner and all others not parties to the combination out of such trade and commerce. The conspiracy was said to involve the establishment of a general tariff rate and a lower contract rate, the lower rate to be made available only to shippers who agreed to confine their shipments to the lines of the defendants. These were alleged to be coercive measures not predicated upon differences in volume or frequency of service but rather to be wholly arbitrary.

It was conceded that looking to the Sherman Anti-Trust Act alone the bill stated a cause of action under Secs. 1 and 2 of the Sherman Act which would warrant an injunction under Sec. 16 of the Clayton Act unless the Shipping Act stood in the way. When the case reached the Supreme Court, that Court's opinion proceeded to state the provisions of the Shipping Act which it described as "a comprehensive measure bearing a relation to common carriers by water substantially the same as that borne by the Interstate Commerce Act to interstate common carriers by land." (P. 480 of 284 U.S., p. 249 of 52 S.Ct.) After reviewing other decisions of the Court, and particularly the case of Texas & Pac. Ry. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553, the Court affirmed the dismissal of the action upon the ground that the matter was "within the exclusive preliminary jurisdiction of the Shipping Board." [7]

The Court reached this conclusion despite the allegation in the bill that the agreement in question had not been filed with the Board pursuant to Sec. 15 of the Shipping Act. The Court stated (284 U.S. p. 486, 52 S.Ct. p. 251): "But a failure to file such an agreement with the Board will not afford ground for an injunction under section 16 of the Clayton Act at the suit of private parties * * * since the maintenance of such a suit, being predicated upon a violation of the anti-trust laws, depends upon the right to seek a remedy under those laws; a right which, as we have seen, does not here exist." [8]

7. The Court said: "The act is restrictive in its operation upon some of the activities of common carriers by water, and permissive in respect of others. Their business involves questions of an exceptional character, the solution of which may call for the exercise of a high degree of expert and technical knowledge. Whether a given agreement among such carriers should be held to contravene the act may depend upon a consideration of economic relations, of facts peculiar to the business or its history, of competitive conditions in respect of the shipping of foreign countries, and of other relevant circumstances, generally unfamiliar to a judicial tribunal, but well understood by an administrative body especially trained and experienced in the intricate and technical facts and usages of the shipping trade, and with which that body, consequently, is better able to deal. * * *

"A comparison of the enumeration of wrongs charged in the bill with the provisions of the sections of the Shipping Act above outlined conclusively shows, without going into detail, that the allegations either constitute direct and basic charges of violations of these provisions, or are so interrelated with such charges as to be, in effect, a component part of them; and the remedy is that afforded by the Shipping Act, which to that extent supersedes the anti-trust laws. Compare Keogh v. C. & N. W. Ry. Co., supra, [260 U.S. 156] at p. 162 [43 S. Ct. 47, 49, 67 L.Ed. 183]. The matter, therefore, is within the exclusive preliminary jurisdiction of the Shipping Board." 284 U.S. at 485, 52 S.Ct. at 250.

8. The reasoning by which the Court arrived at this conclusion, as stated in this quotation, includes a discussion of Sec. 15 of the Shipping Act. After referring to the agreements mentioned in that section the Court said: "Thereupon, the Board is authorized to disapprove, can-

The Cunard case was followed by Far East Conf. v. United States, supra, decided in 1952. That also was a suit to enjoin alleged violations of the Sherman Antitrust Act but it differed from the action in the Cunard case in that this suit was brought by the United States. The violation of the Act complained of was that the defendants, the Far East Conference, and its members, had entered into an agreement establishing a dual rate system. The defendants moved that the complaint be dismissed on the ground that issues involved should properly first be adjudicated before the Federal Maritime Board rather than a district court. The Court said: "We see no reason to depart from [Cunard]. That case answers our problem." [9] The Court characterized the rationale of Cunard as follows: (342 U.S. at 574, 72 S.Ct. at 494) "The Court thus applied a principle, now firmly established, that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over. This is so even though the facts after they have been appraised by specialized competence serve as a premise for legal consequences to be judicially defined. Uniformity and consistency in the regulation of business entrusted to a particular agency are secured, and the limited functions of review by the judiciary are more rationally exercised, by preliminary resort for ascertaining and interpreting the circumstances underlying legal issues to agencies that are better equipped than courts by specialization, by insight gained through experience, and by more flexible procedure."

As noted in the dissenting opinion in Far East, although the conference agreement was approved by the United States Shipping Board, that agreement did not contain any provision for dual rates. It was the dual rate aspect of the defendants' arrangement which was the basis for the Government's antitrust suit. The dissent argued that if the Board had expressly approved the dual rate system there would be immunity from the Sherman Act, but since the agreement as put in operation had not been fully approved, the Court should not hold that the exclusive primary jurisdiction was in the Board. The Court majority did not accept that contention. In Far East, as in Cunard, exclusive primary jurisdiction was in the Board or Commission notwithstanding the questioned provisions of the agreement had not been approved by the Board.

Appellants here argue that neither Cunard nor Far East control this case, since it involves proceedings not to procure an injunction but to recover damages on behalf of a private corporation. There are two reasons why we reject that suggested distinction. In the first place, the considerations which make up the rationale of Cunard and Far East are fully as applicable in a treble damage suit as in one seeking injunction. Preliminary resort to the Commission is as necessary here in order to secure the uniformity of application of the Congressional scheme, and in order to procure resolution of the facts by a body having an adequate appreciation of the intricate business of transportation by sea. As stated in Far East (342 U.S. at 574, 72 S.Ct. at 494) the Cunard case "applied a principle, now firmly established, that in cases raising issues of fact not within

cel, or modify any such agreement, *'whether or not previously approved by it,'* which it finds to be unjustly discriminatory or unfair as between carriers, shippers, etc., 'or to operate to the detriment of the commerce of the United States, or to be in violation of this Act.' * * * If there be a failure to file an agreement as required by section 15, the Board, as in the case of

other violations of the act, is fully authorized by section 22, supra, to afford relief upon complaint or upon its own motion." (Emphasis added.)

9. The fact that the suit was brought by the United States instead of by a private party was held no basis for distinction from the Cunard case.

the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over." Later in this opinion we shall note more fully why this is that sort of case; and it has such character no less because this suit is one for treble damages.

The second reason is the existence of authority to the contrary. The Second Circuit rejected an almost identical contention in American Union Transport v. River Plate & Brazil Conferences, 2 Cir., 222 F.2d 369, where it affirmed a dismissal of a treble damage antitrust suit on the district court's opinion, 126 F.Supp. 91.[10]

Appellants have attempted to demonstrate that the rule applied in Cunard and Far East would no longer be acceptable to the Supreme Court; that those cases have, because of later decisions, been interpreted to mean something different than what they seem to hold. This contention is one which we cannot accept. As late as 1963, in United States v. Philadelphia Nat. Bank, 374 U.S. 321, 353, 83 S.Ct. 1715, 1736, 10 L.Ed.2d 915, the Court cited with apparent approval the Far East Conference case as holding that judicial abstention is

---

10. Plaintiff in that case sued conference members for treble damages, alleging a conspiracy to restrain foreign trade by denying payment to plaintiff of freight brokerage. The Board had jurisdiction under the Shipping Act to include the regulation of freight forwarders and brokers, and had done so. Defendants had put into effect their procedures pursuant to an unfiled and unapproved agreement. The opinion, so adopted, followed and applied Cunard and Far East, saying: "The failure to file an agreement, * * * whatever other effect such failure may have, does not leave the offending parties 'at large', subject to the antitrust laws. If there is any inconsistency apparent between this conclusion and the language of § 15 of the Shipping Act, as pointed out by Mr. Justice Douglas, the clear language of the Supreme Court authoritatively compels the decision. * * * Although the court is not asked for injunctive relief, it is not at all clear that judicial intervention in this field even to the extent of trying a case for damages would not interfere with the uniformity of treatment and the regulatory policy of the board based on specialized considerations within its exclusive competence. * * * It appears indeed, that the plaintiff has filed a complaint with the board against the present defendants asking for reparations under § 22 of the act and for a cease and desist order. It is unreasonable to suggest that the plaintiff may not seek relief from the board under that section, which permits 'any person' to file a complaint. Consequently, a case is presented within the exclusive primary jurisdiction of the Federal Maritime Board." 126 F.Supp. 93.

Since the argument in this case the Second Circuit has decided Trans World Airlines v. Hughes, 332 F.2d 602. The question presented was whether certain conduct of the defendant charged to amount to an attempt to monopolize the business of selling aircraft and aircraft supplies, was immunized from antitrust recovery because of primary jurisdiction in the Civil Aeronautics Board. Holding that such primary jurisdiction did not exist the court noted that the acts charged in the Trans World Airlines case were not, as in Pan American World Airways v. United States, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325, "precise ingredients of the Board's authority," that the transactions charged were "unrelated to any specific function of the C A B," that the Board was given "no explicit jurisdiction" over such transactions, and that in any event the Board was without power to award money damages. Because of these circumstances the case clearly differed from that court's River Plate decision, which it did not even cite; and, for the same reason, it differs from the present case where the authority of the Maritime Commission is as broad as that stated in Cunard as follows: (284 U.S. at 487, 52 S.Ct. at 251) "And whatever may be the form of the agreement, and whether it be lawful or unlawful upon its face, Congress undoubtedly intended that the Board should possess the authority primarily to hear and adjudge the matter. * * * Moreover, having regard to the peculiar nature of ocean traffic, it is not impossible that, although an agreement be apparently bad on its face, it properly might, upon a full consideration of all the attending circumstances, be approved or allowed to stand with modifications."

required "where protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme." And as an inferior federal court we are not about to make rulings based on any assumption that the Supreme Court is likely to repudiate its former decisions.[11]

We think that appellants' effort to assert the lack of continuing authority of Cunard and Far East is entirely fallacious and altogether unsupportable..[12]

Ordinarily we would be content to rest this case upon the authority of the cases we have here cited. But because of the vigor and earnestness with which appellant has argued that those cases are not controlling here, we now proceed to enumerate some of the reasons why we think the results reached in those cases were inevitable, and why the same conclusion as to exclusive primary jurisdiction in the Commission must be upheld here.

## THE SHIPPING ACT'S PERVASIVE REGULATORY SCHEME

In the first place, when we consider the powers and authority of the Commission, we must note that under the Shipping Act, as it was at the time of the matters alleged in the complaint, (and also as it is today), the Commission had, in contrast with the banking agencies in United States v. Philadelphia Nat. Bank, supra, (374 U.S. at 351, 83 S.Ct. 1315) "regulatory and remedial powers." In contrast with the powers of the Fed-

11. In Penfield Co. of Cal. v. Securities and Exch. Com'n, 9 Cir., 143 F.2d 746, 749, this court said: "We cannot agree that an inferior federal court may make its prognostication of the weather in the Supreme Court chambers, however well fortified in judicial reasoning, and forecast that the Supreme Court 'seems' about to overrule its prior decision, and outrun that Court to the overruling goal. It is not a fanciful conjecture that, if such guessing contest were permitted, the ingenuity of judges, stirred by varied philosophies of governmental and social regulations, would find rational arguments for overruling a score of Supreme Court decisions. To the strain on the legal profession of many recent overrulings, some enumerated in the last paragraph of Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757 [88 L.Ed. 987], should not be added that of the overruling prescience of ten circuit courts of appeals and upwards of ninety district courts."

12. There is little point in attempting to spell out the manner in which this portion of appellant's argument proceeds. In general outline it is as follows: In his dissent in the Far East Conference case, Justice Douglas took the position that exclusive primary jurisdiction in the Commission did not apply to unfiled agreements, and that the dual rate agreement there involved was unapprovable under Sec. 14 of the Shipping Act.

In Federal Maritime Bd. v. Isbrandtsen Co., 356 U.S. 481, at 500, 78 S.Ct. 851 at 873, 2 L.Ed.2d 926, Mr. Justice Frankfurter, who had written the opinion in

Far East Conference, dissented from the majority opinion which held that particular approved agreement providing for a dual rate system to be in violation of Sec. 14 of the Shipping Act, saying (at 522, 78 S.Ct. at 873) : "In both cases [Cunard and Far East Conference] the Court's attention was directed to the claim of *per se* illegality. In both cases the plaintiffs urged that, since the dual-rate contract system violated § 14, the Board was without power to approve it. * * * And in Far East Conference, the claim that now prevails was a main ground of dissent." Appellant contends that what Mr. Justice Frankfurter thus said in this Isbrandtsen case demonstates that the majority in Isbrandtsen were reversing and rejecting Cunard and Far East Conference. It must be manifest that appellant's attempt to draw that conclusion from a dissenting opinion must be a fruitless one. This was noted by Mr. Justice Harlan in a separate dissent in that case who disagreed with what Mr. Justice Frankfurter's dissent said about Cunard and Far East Conference. The Isbrandtsen case had nothing to do with the present problem of exclusive primary jurisdiction in the Commission. That case reached the court of appeals and then went on to the Supreme Court on a petition to review a decision of the Federal Maritime Board. It had nothing to do with an attempted suit under the antitrust laws; it dealt solely with the question of the legality of a dual rate system. No issue relating to a dual rate system is before us in the present case.

eral Power Commission in California v. Fed. Power Comm'n, 369 U.S. 482, 485, 82 S.Ct. 901, 8 L.Ed.2d 54, those granted to the Maritime Commission composed a "pervasive regulatory scheme." The following summary of the provisions of the Shipping Act discloses the extremely broad range of regulatory powers, particularly as concerns shipping in foreign trade, vested in the Commission.[13] "The Act prohibits: (1) deferred rebates, (2) 'fighting ships,' (3) retaliation or discrimination against any shipper, and (4) unfair or unjustly discriminatory contracts with any shipper. A fine of not more than $25,000 for each offense is provided as the penalty for a breach of these provisions. If water carriers— other than citizens of the United States —violate the foregoing provisions or deny an American common carrier admission to a conference on equal terms with all other parties, the Secretary of Commerce, upon certification by the Board, is empowered to bar vessels of the offending parties from United States ports.

"All agreements, understandings, conferences, or other arrangements between parties subject to the act which affect competition in any way, or changes in earlier agreements, must, according to Section 15 of the 1916 act, be filed with the Board. The Board, furthermore, may disapprove, cancel, or modify any such agreement or modification thereof deemed to operate to the detriment of United States commerce, to be in violation of the act or to be 'unjustly discriminatory or unfair' between carriers, shippers, exporters, importers, or ports, or between exporters from the United States and their foreign competitors. Approved agreements are exempted from the anti-trust laws. Violators are sub-

ject to a fine of $1,000 for each day of the offense.

"It is unlawful: (1) to give unreasonable preference to any person, locality, or description of traffic, or to subject any of the foregoing to undue disadvantage; (2) to permit by false billing, weighing, etc., transportation at less than regular rates; (3) to influence insurance companies to discriminate against a competitor; and (4) to disclose information detrimental to shippers or consignees. It is also unlawful for any shipper, consignor, or consignee to obtain or attempt to obtain by false billing, false weighing, etc., rates less than otherwise applicable. A fine of not more than $5,000 is provided for each offense.

"The charging of rates or fares that are 'unjustly discriminatory' between shippers or ports, or 'unjustly prejudicial' to United States exporters compared to their foreign competitors, is prohibited, and the Commission is empowered to alter rates which are in violation of this section. Reasonable regulations covering practices relating to receiving, handling, storing, or delivery of property must be observed, and the Board has authority to require the filing of reports, records, etc., of any person subject to the Act. The Board is also authorized to investigate any violation of the act on its own volition, or upon the filing of a complaint. In the latter case full reparation for injury may be awarded if the complaint is filed within two years of the cause of action." [14]

A key provision of the Act, significant here, is Sec. 15 (46 U.S.C. Sec. 814) which provides that common carriers and conferences thereof, such as the defendants in this case, shall file their agreements for regulating transportation or rates, or controlling competition, or pro-

13. Since the complaint here refers to acts and things alleged to have been done by the defendants between "before January, 1953" (including November, 1952) to and including May, 1961, we have chosen to describe the powers of the Commission under the Shipping Act as that Act existed prior to the amendments of October 3, 1961, Pub.L. 87-346, 75 Stat. 762.

A consideration of the 1961 amendments would lead to no different conclusion than that we reach here.

14. This quoted summary is from Marx, International Shipping Cartels: A Study of Industrial Regulation by Shipping Conferences, pp. 106–107.

viding for cooperative working arrangements, with the Commission. The section, as it read at the time here in question, is set forth in the margin.[15] In brief, it authorizes the Board to "disapprove, cancel, or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it" that it finds to be unjustly discriminatory or unfair and the Commissioner is required to approve all other agreements. It makes such agreements lawful only when and as soon as approved by the Board, and makes it unlawful to carry out an unapproved agreement. It provides that agreements lawful under the section shall be excepted from the provisions of the antitrust laws and provides a penalty of $1,000 for each day of violation continuance.

Another key section is section 22 (46. U.S.C. Sec. 821) which is set forth in full

in footnote 4, supra. It is this section which provides for the filing of complaints with the Commission alleging violation of the Act and asking reparation for the injury caused thereby. The Commission shall investigate complaints and shall make such orders as it deems proper; it is authorized to award full reparations to the complainant. The Board may on its own motion investigate any violation of the Act and make similar orders with respect thereto.

The Act provides for full hearing in relation to any complaint or proceeding pertaining to violations of the Act, for the keeping of records of the Board, and for publication of its reports; it authorizes enforcement of the orders of the Board by district court order, and provides for a review or setting aside of orders by the appropriate court.[16] In the exercise of its "regulatory and remedial

15. "§ 814. Contracts between carriers filed with Board. Every common carrier by water, or other person subject to this chapter, shall file immediately with the Federal Maritime Board a true copy, or, if oral, a true and complete memorandum, of every agreement, with another such carrier or other person subject to this chapter, or modification or cancellation thereof, to which it may be a party or conform in whole or in part, fixing or regulating transportation rates or fares; giving or receiving special rates, accommodations, or other special privileges or advantages; controlling, regulating, preventing, or destroying competition; pooling or apportioning earnings, losses, or traffic; allotting ports or restricting or otherwise regulating the number and character of sailings between ports; limiting or regulating in any way the volume or character of freight or passenger traffic to be carried; or in any manner providing for an exclusive, preferential, or cooperative working arrangement. The term 'agreement' in this section includes understandings, conferences, and other arrangements.

"The Board may by order disapprove, cancel, or modify any agreement, or any modification or cancellation thereof, whether or not previously approved by it, that it finds to be unjustly discriminatory or unfair as between carriers, shippers, exporters, importers, or ports, or between exporters from the United

States and their foreign competitors or to operate to the detriment of the commerce of the United States, or to be in violation of this chapter, and shall approve all other agreements, modifications, or cancellations.

"Agreements existing at the time of the organization of the Board shall be lawful until disapproved by the Board. It shall be unlawful to carry out any agreement or any portion thereof disapproved by the Board.

"All agreements, modifications, or cancellations made after the organization of the Board shall be lawful only when and as long as approved by the Board, and before approval or after disapproval it shall be unlawful to carry out in whole or in part, directly or indirectly, any such agreement, modification, or cancellation.

"Every agreement, modification or cancellation lawful under this section shall be excepted from the provisions of sections 1–11 and 15 of Title 15, and amendments and Acts supplementary thereto.

"Whoever violates any provision of this section shall be liable to a penalty of $1,000 for each day such violation continues, to be recovered by the United States in a civil action."

16. Since 1950 review of the Commission's orders is by courts of appeals under Chapter 19A of 5 U.S.C. Secs. 1031 to 1042.

powers" to enforce the Act's "pervasive regulatory scheme", it is for the Commission to pass upon the following questions: whether the defendants did or did not make certain agreements, whether those agreements, if made were such as to require Commission approval, whether such agreements, if not filed, should nevertheless, now, in the language of the Cunard case, "upon a full consideration of all the attending circumstances, be approved or allowed to stand with modification." These are, as we shall more fully note hereafter, "precise ingredients of the [Commission's] authority." Pan American World Airways v. United States, 371 U.S. 296, 305, 83 S.Ct. 476, 482.

## TO ESTABLISH A CONTROLLED SYSTEM OF AGREEMENTS DESIGNED TO LIMIT COMPETITION

■ Another reason why we think it must have been the congressional intention, as held in the cases previously cited, that exclusive primary jurisdiction should rest with the Maritime Commission, is that the congressional objectives in the passage of the Shipping Act were entirely different from the objectives designed to be obtained through the antitrust acts. In the case of the latter, the congressional purpose was, as has been so often noted, to preserve, protect and enforce full and free competition. But the legislative history of the Shipping Act discloses that Congress had in mind in that enactment a very different objective due to the special problems of shipping lines in foreign trade which called for a special and different mode of regulation than that provided by the antitrust laws.

The Alexander Report [17] which led to the enactment of the Shipping Act, discloses that the object of the Act was to permit a controlled system of agreements designed to *limit* competition.[18] In these respects it was similar to certain portions of the Federal Aviation Act, concerning which the Court said in Pan American World Airways v. United States, supra, at p. 301, 83 S.Ct. 476, at p. 480: "Since 1938, the industry has been regulated under a regime designed to change the prior competitive system." The objec-

17. House Com. on Merchant Marine and Fisheries, Report on Steamship Agreements and Affiliation in the American Foreign and Domestic Trade, 4 H.R.Doc. No. 805, 63d Cong.2d Sess. (1914) pp. 415 to 421.

18. The Committee noted that it had been the almost universal practice for steamship lines engaged in the American foreign trade to operate under the terms of agreements or understandings which had for their purpose the regulation of competition through fixing or regulating of rates, apportionment of traffic, the pooling of earnings, or meeting the competition of non-conference lines. The Committee considered two alternatives: either the prohibition of such agreements with a view to "attempting the restoration of unrestricted competition" or recognizing such agreements and permitting them under circumstances which would eliminate abuses. The Committee noted the advantages and disadvantages of these alternative proposals, and concluded that the advantages which were substantial, "can be secured only by permitting the several lines in any given trade to cooperate through some form of rate and pooling arrangement under government supervision and control." The Committee observed that "to terminate existing agreements would necessarily bring about one of two results: the lines would either engage in rate wars which would mean the elimination of the weak and the survival of the strong, or, to avoid a costly struggle, they would consolidate through common ownership."

The Committee's recommendation was that the administration of the Act should be left to the Interstate Commerce Commission. That portion of the recommendation was not adopted; instead the Congress established the United States Shipping Board whose functions were later vested in the United States Maritime Commission, which in turn was succeeded by United States Shipping Board, which was in turn succeeded by the Federal Maritime Commission, the present intervener. See Historical Note at 46 U.S.C. § 804.

tive of limiting competition led to the provision in Sec. 15 that agreements lawful under that section "shall be excepted from the provisions of sections 1–11 and 15 of Title 15."

In Cunard the Court noted that the proper place to determine whether this special regime designed to change the prior competitive system should be effective was before the board.[19]

## UNDER DIRECTION OF A COMMISSION SPECIALIZING IN OCEAN TRANSPORTATION

Another reason for our conclusion is that Congress, in setting up this elaborate system of controlled cooperation in respect to rates, shipping conditions, and other matters relating to carriers in foreign trade, and committing its regulation and enforcement to a special commission, contemplated that this commission would become familiar with the problems of foreign water-borne com-

merce and develop considerable expertise in connection therewith.

The Act lists many standards whose application requires more than ordinary familiarity with ocean transportation.[20] Thus it seems appropriate to say that the Commission is the body most qualified to decide what agreements will, or will not, "operate to the detriment of the commerce of the United States." [21] As was said in Cunard, supra, (284 U.S. p. 487, 52 S.Ct. p. 251) "Moreover, having regard to the peculiar nature of ocean traffic, it is not impossible that, although an agreement be apparently bad on its face, it properly might, upon a full consideration of all the attending circumstances, be approved or allowed to stand with modifications."

The Commission, so far as we are advised, has not yet acted upon the examiner's initial report; but that report discloses that the examiner has recommend-

19. Said the Court (284 U.S. at 487, 52 S.Ct. at 251): "And whatever may be the form of the agreement, and whether it be lawful or unlawful upon its face, Congress undoubtedly intended that the Board should possess the authority primarily to hear and adjudge the matter. For the courts to take jurisdiction in advance of such hearing and determination would be to usurp that authority. Moreover, having regard to the peculiar nature of ocean traffic, it is not impossible that, although an agreement be apparently bad on its face, it properly might, upon a full consideration of all the attending circumstances, be approved or allowed to stand with modifications."

20. Some of the phrases used are "unjustly discriminatory or unfair as between carriers, shippers, exporters, importers or ports * * * or to operate to the detriment of the commerce of the United States" (Sec. 15, referring to agreements to be disapproved); "any unfair or unjustly discriminatory contract with any shipper", "other discriminatory or unfair methods" (Sec. 14); "any other unjust or unfair device or means" (Sec. 16); "any rate * * * which is unjustly discriminatory between shippers or ports, or unjustly prejudicial to exporters of the United States", the Commission may "order enforced a just and rea-

sonable regulation or practice" (Sec. 17); the carrier by water must establish "just and reasonable regulations and practices" (Sec. 18).

21. Compare the following from Pan American World Airways v. United States, 371 U.S. at p. 309, 83 S.Ct. at p. 484: "The 'present and future needs' of our foreign and domestic commerce, regulations that foster 'sound economic conditions,' the promotion of service free of 'unfair or destructive competitive practices,' regulations that produce the proper degree of 'competition'—each of these is pertinent to the problems arising under § 411.

"It would be strange, indeed, if a division of territories or an allocation of routes which met the requirements of the 'public interest' as defined in § 2 were held to be antitrust violations. It would also be odd to conclude that an affiliation between a common carrier and an air carrier that passed muster under § 408 should run afoul of the antitrust laws. Whether or not transactions of that character meet the standards of competition and monopoly provided by the Act is peculiarly a question for the Board, subject of course to judicial review as provided in 49 U.S.C. § 1486."

ed the very thing suggested in the last quotation from Cunard—he has recommended that agreement No. 8200 be amended with changes to comply with his findings, "and that as amended Agreement No. 8200 should be reapproved." [22]

It seems to us to be wholly inappropriate that a court and jury should, while this proceeding still pends, inject themselves into this matter and undertake to say what portions of the existing agreement are good and what parts are bad.

## WITH A VIEW TO UNIFORMITY IN REGULATION

■ Again, one prime purpose of the Shipping Act is to procure uniformity in the treatment of ocean carriers and their shippers. The Act is replete with provisions designed to avoid discrimination. See footnote 20, supra. To permit the maintenance of an action such as this would in our view produce for the shipping industry confusion worse confounded, destroy uniformity of interpretation and enforcement of the Shipping Act, and bring about the very type of discrimination which that Act was designed to avoid. We may assume that Carnation is not the only shipper who dislikes the rates fixed for shipment of its product. Carnation might win its suit and another similar concern, making a similar claim, might lose.

The undesirable results of a recovery by Carnation in such a case would be similar to those discussed by the Court in Keogh v. Chicago & N. W. Ry. Co., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183, which was an action to recover damages alleged to have resulted from a combination to fix railroad rates in restraint of interstate commerce. The complaint alleged that certain uniform rates, fixed by an association of railroads, were arbitrary and unreasonable and higher than those theretofore charged and higher than they would have been if competition had not been eliminated. The rates complained of had been duly filed with and approved by the Interstate Commerce Commission. It was held that Keogh, a private shipper, could not maintain his action for damages, and the action of the lower court in dismissing the case, was affirmed. It was noted that the shipper had recourse under the Interstate Commerce Act to secure redress for damages suffered in consequence of illegal rates. The Court said: "Can it be that Congress intended to provide the shipper, from whom illegal rates have been exacted, with an additional remedy under the Anti-Trust Act?" The Court said: "This stringent rule prevails, because otherwise the paramount purpose of Congress—prevention of unjust discrimination—might be defeated. If a shipper could recover under section 7 of the Anti-Trust Act for damages resulting from the exaction of a rate higher than that which would otherwise have prevailed, the amount recovered might, like a rebate, operate to give him a preference over his trade competitors. It is no answer to say that each of these might bring a similar action under section 7. Uniform treatment would not result, even if all sued, unless the highly improbable happened, and the several juries and courts gave to each the same measure of relief." Since the Shipping Act vests the Commission with these extensive powers to investigate and bring to a halt the "unjustly discriminatory" and "unfair" acts prohibited and practices which "operate to the detriment of the commerce of the United States", it may be said here, in the language of Pan American World Airways, su-

---

22. The final paragraph in the examiner's report is as follows: "Based upon the whole record, it is concluded, ultimately, that Agreement No. 8200 has not operated to the detriment of the commerce of the United States or otherwise contravened Section 15 of the 1916 Act, but on the other hand it has been large-

ly beneficial to such commerce; that it should be amended to incorporate the complete agreements found herein to be outside the scope of said agreement, with such changes made therein as will comport with the findings in this decision; and that as amended Agreement No. 8200 should be reapproved."

pra, "[i]f the courts were to intrude independently with their construction of antitrust laws, two regimes might collide."

This necessity of attaining uniformity in the administration of a regulatory system such as here involved, was noted by Mr. Justice Brandeis in Great No. Ry. v. Merchants Elev. Co., 259 U.S. 285, 292, 42 S.Ct. 477, 66 L.Ed. 943, where speaking with reference to the functions of the Interstate Commerce Commission in relation to the construction of tariffs, he said that where a controversy involves any more than a pure question of law "the preliminary determination must be made by the Commission; and not until this determination has been made, can a court take jurisdiction of the controversy. If this were not so, that uniformity which it is the purpose of the Commerce Act to secure could not, be attained."

### EXTENDING ALSO TO FOREIGN CARRIERS

Another reason why Congress must have intended to leave the resolution of the problems here present to this specialized commission is that the Shipping Act regulates not merely American shipping companies but foreign carriers as well. As noted by Marx,[23] the majority of shipping conferences are international in the sense that they consist of companies under various national flags. An examination of the list of defendants in this suit will disclose that a very large percentage of them are carriers operating under foreign flags and are foreign owned. Those carriers which are not American but which operate on routes between the United States and foreign countries are through the Shipping Act subject to a degree of regulation by this American Commission. The situation is to a degree similar to that mentioned in Pan American World Airways v. United States, supra, 371 U.S. at p. 310, 83 S.Ct. at p. 485, where the Court said: "Furthermore, many of the problems presented by this case, which involves air routes to and in foreign countries, may involve military and foreign policy considerations * * *."[24]

### ALL OF WHICH CALLS FOR ADMINISTRATIVE EXPERIENCE AND SPECIAL KNOWLEDGE

In its essence, the appellant's case is tied to its construction of the decision of the Court in Great No. Ry. v. Merchants Elev. Co., supra. Says the appellant: "As a matter of decision this case is controlled by Great Northern R. Co. v. Merchants Elevator Co., above, the case on which Cunard principally relied. This is an even simpler case. In that case there was a question of construction of a tariff. There was no need to resort to the Commission because that was a question of law. In the case at bar there is no need for construction of a tariff at all. We make a case without regard for the

23. Marx, International Shipping Cartels: A Study of Industrial Regulation by Shipping Conferences, 1953, p. 137.

24. The Alexander Committee was not unmindful of this situation. Its report (V. 4 p. 416) stated: "The merchants of these countries now enjoy the foregoing advantages of cooperative arrangements, and to restore open and cutthroat competition among the lines serving the United States would place American exporters at a disadvantage in many markets as compared with their foreign competitors."

That the regulation of these conferences does indeed involve delicate foreign policy considerations is apparent from incidents in current history. As reported in the New York Times of July 16, 1964, under Reuters dispatch from London, "Transport Minister Ernest Marples assailed the United States Maritime Commission for 'acting as if the United States has the right to regulate the affairs of the world as a whole'". He offered a bill authorizing British ministers to order British ship lines "not to comply with American and other foreign shipping laws that the ministers consider an infringement on British jurisdiction." He was quoted as saying: "The Federal Maritime Commission claims the right to dictate to traders and shipowners in this country the form of contracts between them regardless of who owns the ships and where the contract is being negotiated."

tariff terms, because we are concerned only with the illegal charge of $2.50 per ton above the lawful tariff whatever that tariff is."

In our view the case thus relied upon by the appellant has no relation to the problem here before us. That case had nothing to do with any problem arising under the Shipping Act. It was a simple action to recover sums paid the railway company alleged to have been collected in violation of the carrier's tariff. The sole question was whether Rule 10 of the tariff, as filed, called for a reassignment charge of $5 a car for 16 cars of corn which were shipped from Iowa and Nebraska to a station in Minnesota where they were inspected and then re-billed to a station beyond. The sole question was what did the tariff provide and what did its text mean. As an apparent effort to suggest that the present case is like the Great Northern case, appellant asserts that this is "a simple overcharge case." We must disagree.

The whole thrust of the complaint in this case is that the defendants entered into agreements which differ from or were modifications of their filed and approved agreements, such as their Agreement 8200; that the agreements so entered into were required by law to be filed with and approved by the Commission; that this was not done; that pursuant to these unapproved agreements rates were agreed upon and fixed, and that in consequence of the failure to procure Commission approval, defendants were liable under the antitrust acts.

■ Cunard and Far East Conference, as we have noted, both hold that failure of approval does not affect the

Commission's primary jurisdiction. But even if it did, the question would remain as to whether what defendants did amounted to agreements which required Commission approval. And that is something for the Commission to decide. If it should decide that defendants have been acting under agreements which should have been filed, but were not, the Commission under Sec. 22 of the Act, could adjudge a violation of the Act, as in Trans-Pacific Frgt. Conf. of Japan v. Federal Maritime Com'n, 9 Cir., 314 F.2d 928. And, of course, the Commission, as we shall note hereafter, might find the conduct of the defendants in respect to the rates mentioned in the complaint was wholly within and authorized by the filed and approved agreements. But in passing upon these matters the Commission must necessarily employ a specialized judgment and a determination of fact, policy and law, not within the conventional experience of a judge or jury.

The same is true of the alleged agreement not to disclose to any shipper how the members of the Conference voted on rate requests.[25] Of course the Commission may well, under its broad powers to prohibit conduct which it finds to be "unfair" or to "operate to the detriment of the commerce of the United States", adopt a rule requiring disclosure of votes at conference meetings; but a determination of that kind would represent the sort of action which may properly be committed to an administrative body rather than to a court or jury.[26]

It is complained that the members of both conferences agreed that they would make no changes in rates which had been.

25. We know of no present rule requiring meetings to be public. The Alexander report mentioned "the secrecy with which agreements and conferences are now conducted," (p. 417 of the Committee Recommendations) yet no effort was made in proposing the resultant legislation to prohibit such secrecy.

26. The determination of such a policy question would necessarily take into con-

sideration the problem of whether publication of votes at meetings would be likely to result in the shippers granting their preferences in shipments to carriers who voted for rate reduction. That decisions of this kind are commonly "carefully kept business secrets" is noted in Marx, supra, p. 141. We are not aware of any Commission ruling on this subject.

agreed to without the concurrence of both conferences. It is plain that the arrangement provided for by agreement No. 8200 contemplated joint action in the establishment of rates. It recited that for the accomplishment of the purpose of this agreement "it is essential that the parties shall, from time to time, establish the rates to be charged for the transportation of commodities, and the rules and regulations governing the application of said rates."

The agreement provided that certain actions should be determined only by a concurrence of the two groups "with respect to the establishment or change of rates." Obviously members of the Far East Conference carrying goods from Atlantic and Gulf ports would be affected by and interested in the rates from Pacific ports. Plainly that is why Agreement 8200 was made. The provision for joint action was eminently a reasonable one. Under Sec. 18 of the Shipping Act if the Commission found that any rate was unjust or unreasonable it could prescribe a reasonable maximum rate. This, again, is a matter for determination by the Commission. But, if the two Conferences agree to an increase of $2.50 per ton on evaporated milk, such was no more than a fixing of rates as contemplated in Agreement 8200. The Shipping Act sets up a system of industry self-regulation. No power to fix or specify rates was granted to the Commission or its predecessors. In contrast with the Interstate Commerce Commission (see 49 U.S.C. Sec. 15) the Maritime Commission does not fix rates. The rates were and are fixed by the Conferences under their approved agreement subject only to the power of the Commission just mentioned to set aside unjust or unreasonable rates.

It is also complained that the agreement contemplated that when the rates were announced Pacific Westbound Conference would falsely pretend to act under its Agreement No. 57. The terms of Agreement No. 57 are not in this record. Presumably it, as do most conference agreements, authorizes the fixing of rates by the Conference. Conceivably the Maritime Commission could establish a rule requiring such a conference, when it files its rates and charges with the Commission pursuant to Sec. 18 of the Shipping Act, to specify precisely under which particular approved agreement it is operating when it fixes such rates. We know of no such rule and nothing appears to show that under either Agreement 8200 or Agreement 57 the Conferences have any obligation to specify which approved agreement they are relying upon in fixing a particular rate.

As for the claim that the defendant Conferences entered into a new agreement "contrary to the provisions of said Agreement No. 57 and said Agreement No. 8200" that a rate established or fixed by or for Pacific Westbound Conference and its members would not be changed without the concurrence of Far East Conference, we have for inquiry the question whether such an agreement was made in fact; whether, if made, it was contrary to Agreement No. 8200; and finally, whether it would be required to be filed with and approved by the Commission.

This calls for a reference to Agreement No. 8200 which was made a part of the record before the district court. We have noted that it expressly provided for and obviously contemplated the establishment of rates by agreements between both conferences. This approved agreement expressly provided that rates should be determined only by a concurrence of the two conferences each acting as a group and in accordance with the procedures prescribed by its conference agreement with respect to the establishment or change of rates. Paragraph "second" of that Agreement was a provision that if either Conference should determine that conditions affecting its operations required an immediate change in its tariffs it could notify the other group specifying the changes it proposed to put into effect 48 hours after giving such notice, if given by telegram, or 72 hours, if given by airmail. It provided for the giving of a summary of

the facts which would justify such independent action.

At the times here in controversy there was nothing in the Shipping Act as it then stood or in the then regulations of the Commission requiring an insertion of such a stipulation in a Conference agreement.[27] The stipulation in this paragraph "second" was obviously inserted by voluntary action of the signatories to Agreement 8200. Its plain reading indicates that the exercise of this right of independent action is discretionary with the conference. Nothing contained therein compels utilization of that privilege and it would appear that the Commission, when it reaches this question, might well hold that the exercise of that privilege could be waived in any particular case; or, on the other hand, the Commission might well hold otherwise; and the Commission might hold with respect to the rate referred to in the complaint here that Pacific Westbound Conference merely waived its right to take that independent action as it then had the right to do. Furthermore, the Commission could well find that

this waiver was a single occurrence and that there was no agreement never to use that right of independent action.[28]

The important point here is that these matters presented questions of fact and of policy properly for the specialized competence of the Commission. If the Commission finds that there was a mere temporary waiver of the independent action provision, and not a permanent alteration of the agreement, then it might hold that no filing of the new agreement would be required. The Commission has long recognized that not every arrangement or understanding between carriers must be filed for approval by the Commission.[29]

We must therefore conclude that what is involved here is the conduct of common carriers by water whose "business involves questions of an exceptional character, the solution of which may call for the exercise of a high degree of expert and technical knowledge." (284 U.S. at 485, 52 S.Ct. at 250) There is first the question of what did the Conferences here actually do. This should be decided, it seems plain, by the Commis-

27. When Sec. 15 was amended, Oct. 3, 1961, Pub.L. 87–346 Sec. 2, 75 Stat. 763, it contained a new provision that no agreement should be approved between carriers not members of the same conference unless "each conference, retains the right of independent action."

28. The examiner's report, previously mentioned, recited that Pacific Westbound Conference did in fact invoke its right of independent action on one occasion involving Korean relief cargo and one other occasion in reducing rates on Kraft liner board. This would seem to negative any agreement never to act independently. In the hearing before the examiner the Conferences' position was that their privilege of independent action should be employed only in "serious" or "important" situations.

29. Its regulation, 46 C.F.R. Sec. 222.16, provides as follows: "Statements Not Accepted For Formal Filing. Statements of routine arrangements for carrying out authorized agreements will not be accepted for formal filing by the Board but may be received as· information."

In an opinion by the predecessor shipping board, reported at U.S. Maritime Commission Reports Vol. 1, p. 121, consideration was given to the question as to whether the reference in Sec. 15 of the Shipping Act to the filing of "every" agreement was intended to include all arrangements made between carriers in the routine process of carrying out their conference agreements. The Board concluded that the agreements required to be filed are to be distinguished from the mere "routine" conference activities. If what we have here should be found by the Commission to have been a mere temporary waiver by Pacific Westbound Conference of its right of independent action in respect to the rate complained of in the complaint, then the Board might hold that no agreement of a character required to be filed had been entered into. That, however, is a matter for the expertise of the Commission. For a case involving the question of what constitutes a separate agreement required to be filed, see American Export & Isbrandtsen Lines, et al. v. Federal Maritime Commission, et al., (1964) 9, Cir., 334 F.2d 185.

-sion which has already entered upon such an inquiry. The next question is whether or not what was done was of such character as to require the presentation for approval of a new agreement. Here we enter upon a matter "well understood by an administrative body especially trained and experienced in intricate and technical facts and usages of the shipping trade." United States Nav. Co. v. Cunard S.S. Co., supra, at p. 485, 52 S.Ct. at p. 250.[30]

And finally, under the decisions and the Cunard and Far East Conference cases, even if it should be held that a new agreement had been made here which required approval of the Board, the exclusive primary jurisdiction is in the Board and not in the district court.

There is one question in the background of this case which we need not meet at this time. Some doubt is raised in our minds by the language used in the concluding portions of Far East Conference where the Court said (342 U.S. p. 576, 72 S.Ct. p. 495): "Having concluded that initial submission to the Federal Maritime Board is required, we may either order the case retained on the District Court docket pending the Board's action, * * * or order dismissal of the proceeding brought in the District Court." The Court then went on to say "An order of the Board will be subject to review by a United States Court of Appeals, with opportunity for further review in this Court on writ of certiorari. * * * If the Board's order is favorable to the United States, it can be enforced by process of the District Court on the Attorney General's application." The

Court then proceeded to order the district court suit to be dismissed as was the complaint in the Cunard case, where the Court used the words "exclusive preliminary jurisdiction." [31]

This language seems to suggest that there might be circumstances under which the final determination of the Commission would be such as to lay a ground work for a later antitrust suit, perhaps where there had been a complete and egregious failure even to attempt to comply with the Shipping Act.

On the other hand, in language which we have previously quoted, the Court in Cunard suggested that the intervening agreement there referred to "might, upon a full consideration of all the attending circumstances, be approved or allowed to stand with modifications." We would assume that if such action were taken by the Commission no antitrust proceedings would be in order.

We do not find it necessary to resolve this question as to whether there might ultimately arise out of the situation here presented a right to relief under the antitrust laws.[32] We hold that we should, under the circumstances of this case, follow the action taken by the Supreme Court in Far East Conference and approve the dismissal of the action by the district court.

The judgment is affirmed.

UPON PETITION FOR REHEARING

PER CURIAM.

Appellant's petition for rehearing discloses a failure to note the main thrust of the opinion which holds that appel-

30. We note in the examiner's report, previously mentioned, the following: "It is further found and concluded that the requirement that both conferences concur in matters voted on by said conferences is authorized by the approved basic agreement, and therefore is not in violation of said Section 15."

31. For a discussion of the difference between what is there called "primary exclusive jurisdiction" and "primary non-

exclusive jurisdiction", see "Antitrust and Regulated Industries", 38 New York University Law Review, 604, 615.

32. The only possible reason for allowing the action to be retained on the district court docket would be to avoid a claim that antitrust action was barred by the statute of limitations. Since we hold that such an action cannot at this date be maintained, this reason is not applicable here.

**668**

lant's action in the court below was properly dismissed on the ground that the matters complained of were within the primary jurisdiction of the Federal Maritime Commission.

Appellant has failed to note that we said: (immediately following the reference to footnote 16 on page 659) "In the exercise of its 'regulatory and remedial powers' to enforce the Act's 'pervasive regulatory scheme', it is for the Commission to pass upon the following questions: whether the defendants did or did not make certain agreements, whether those agreements, if made were such as to require Commission approval * * *." Again we discuss this matter at great length (beginning at the middle of page 664, where we said among other things: "Cunard and Far East Conference, as we have noted, both hold that failure of approval does not affect the Commission's primary jurisdiction. But even if it did, the question would remain as to whether what defendants did amounted to agreements which required Commission approval. And that is something for the Commission to decide. If it should decide that defendants have been acting under agreements which should have been filed, but were not, the Commission under Sec. 22 of the Act, could adjudge a violation of the Act, as in Trans-Pacific Frgt. Conf. of Japan v. Federal Maritime Com'n, 9 Cir., 314 F.2d 928. And, of course, the Commission, as we shall note hereafter, might find the conduct of the defendants in respect to the rates mentioned in the complaint was wholly within and authorized by the filed and approved agreements. But in passing upon these matters the Commission must necessarily employ a specialized judgment and a determination of fact, policy and law, not within the conventional experience of a judge or jury." The point there made was discussed, both before and after the quoted language, at considerable length.

In short, we believe that the petition for rehearing is predicated upon a misunderstanding of our opinion. The petition is denied.