SUNOCO ENERGY DEVELOPMENT CO., Plaintiff,

v.

BURLINGTON NORTHERN INC., and Chicago and North Western Transportation Company, Defendants.

No. C79–137B.

United States District Court, D. Wyoming.

Jan. 14, 1980.

Stanley K. Hathaway of Hathaway, Speight & Kunz, Cheyenne, Wyo., Owen M. Johnson, Jr. of Akin, Gump, Hauer & Feld, Washington, D. C. and Joseph Swift, Dallas, Tex., for plaintiff.

Paul B. Godfrey of Godfrey & Sundahl, Cheyenne, Wyo., R. Eden Martin, Washington, D. C. and Jack R. Bierig of Sidley & Austin, Chicago, Ill. and Curtis H. Berg, St. Paul, Minn., for defendant Burlington Northern.

Donn J. McCall and Ronald L. Brown of Brown, Drew, Apostolos, Massey & Sullivan, Casper, Wyo., Earl E. Pollock and Jeffrey L. Dorman of Sonnenschein, Carlin, Nath & Rosenthal, Chicago, Ill., for defendant Chicago and North Western.

## MEMORANDUM OPINION AND ORDER DENYING MOTIONS TO DISMISS

BRIMMER, District Judge.

This is a simple case of an alleged horizontal market restraint by an agreement that divides a market area and thereby allegedly stifles competition contrary to the Sherman Anti-Trust Act, 15 U.S.C. § 1. It has been unusually complicated by the Interstate Commerce Commission's (hereinafter referred to as "I.C.C." or "Commission") actions, as well as its inaction.

The Plaintiff, Sunoco Energy Development Co. (herein referred to as "Sunedco") has a coal mine known as the Cordero Mine, located just north of Coal Creek Junction in the Eastern Powder River Basin of Wyoming, a large area of enormous, prolific, low-sulphur coal deposits minable by strip methods. The area is estimated to contain upwards of 8 billion tons of coal reserves, and perhaps much more. Most of the coal from that basin is transported by rail. Since December 1976 Sunedco has marketed its coal from the Cordero Mine to electric utilities in the midwestern and southwestern states.

Prior to the development of many mines in the Eastern Powder River Basin, both of the Defendants, Burlington Northern Inc. (herein referred to as "BN") and the Chicago and North Western Transportation Company (herein referred to as "CNW"), as common carriers, had trackage over the region. In 1972 and 1973 they each applied to the I.C.C. for authority to provide rail service to the mines in the Eastern Powder River Basin (I.C.C. Finance Dockets Nos. 27208 and 27392). That would have entailed construction of competing lines that would have been approximately parallel. At the recommendation and request of the Commission, BN and CNW filed a joint

application on February 4, 1974 to construct and operate a single line, specifying that BN would be sole owner and operator of new trackage north of a point known as Coal Creek Junction, while the trackage south of Coal Creek Junction would be jointly owned and operated. (I.C.C. Finance Docket No. 27579). The Commission approved the application on January 9, 1976. BN rail service on the new line north of Coal Creek Junction became operational in late 1976—early 1977. The line south of Coal Creek Junction was placed in service November 6, 1979. The entire line was constructed at a cost of $76,000,000 by BN, which has borne all of the costs of construction. CNW as of early December 1979 was not operating on the so-called Orin-Gillette line or moving any traffic over it.

In its Order of January 9, 1976 the Commission noted that routing coal over the new line would result in an average reduction of 100 miles per train movement, and result in $35,700,000 to $61,900,000 savings in operating and maintenance of way savings, according to Defendants' application. The Commission found that two railroads serving the same territory over separate lines would result in wasteful and improvident expenditures for construction, which were not necessary to ensure adequate service, and further found that "the Nation's need for alternative sources of energy . . in part, could be met by the low-sulphur coal traffic to be transported by the line . . .". However, instead of selecting either of the two Defendants to construct the line, the I.C.C. chose to consider only their joint application and not their individual applications, approving construction of a line extending approximately 112.5 miles south from BN's existing Gillette Branch Line in Wyoming, providing that BN would own and operate the 9 mile track segment north of Coal Creek Junction and that the remaining trackage called the "joint line" would be jointly owned and operated by BN and CNW. One Commission member dissented on the ground that CNW had not demonstrated an ability to finance the proposed construction.

On May 22, 1975 BN and CNW entered into a "Gillette-Douglas Joint Line Agreement", which provides for the construction and operation of the "Joint Line". This agreement resulted from a meeting of the Defendants with a Commission member in the I.C.C. offices on December 5, 1973, where the Commissioner said it was unlikely that the Commission would grant both of their competing rail-line applications and suggested that they reach an agreement on a single, joint line, which they did that day (Affidavit, Louis T. Duerninck, June 26, 1979). Thereafter, on February 22, 1975, drafts of two agreements pertaining to construction, ownership and operation of the line was submitted by BN's counsel to the I.C.C. which are said to have contained substantially all of the terms of the subsequently executed agreement of May 22, 1975, which however were not referred to by the I.C.C. in its order granting the joint application. (Duerninck Aff. pp. 3–4). The Joint Line agreement provided for sole ownership by BN of trackage north of Coal Creek Junction and for joint and equal ownership, each party owning a one-half interest, of the trackage south of there. BN was to let the construction contracts, with CNW's prior approval. Materials and equipment were to be provided or delivered by the parties at cost, for the construction. Each were to furnish cars to move the ballast. Each were to have "full and unrestricted operating rights over all portions of the joint line", with its own power, equipment and crews, but unit train traffic was to be handled on a pooling of revenues and expenses basis, with each bearing 50% of the expenses and receiving 50% of the revenues. BN was to maintain the entire joint line, and to have the exclusive direction and control of the operation of the joint line. This comprehensive agreement also makes extensive provisions for periodic examination of all railroad personnel of the parties, compliance with the Consolidated Code of Operating Rules and other rules and regulations, construction of facilities attached to the line, as well as provisions for other contingencies envisioned by its drafters. Capital contributions were to be equal ex-

cept that BN was to bear all costs of its line north of Coal Creek Junction. The parties are required to contribute equally to the costs of spur tracks to serve coal mines arising out of the joint line. The cost of construction was to be paid by the party incurring construction costs billing the other on a semi-monthly basis. In the event of CNW's consolidation or merger with Union Pacific, Southern Pacific or the Santa Fe, BN was granted an option to purchase the entire line. Disputes between them were to be settled by arbitration. The agreement was to last for 99 years. Most importantly, this extensive Joint Line Agreement of 62 pages on its 4th page provided:

"C. *Territory Limitations.* Each party agrees that it shall not originate via its solely-owned lines of railroad any traffic loaded at a site located closer in a straight-line distance to the joint line than it is to its solely-owned line. Neither party shall construct nor permit to be constructed to its solely-owned line of railroad any spur or side track whose use would be in contravention of the first sentence of this paragraph. North Western agrees that it shall not originate via the joint line any coal produced north of the northerly terminus of the joint line even if the loading site of such coal is south of Coal Creek Junction."

The Joint Line Agreement was first supplemented on June 1, 1976 by a Supplemental Agreement which provided that BN would commence construction, bearing the full cost thereof, but that CNW would not be responsible for obligations between May 11, 1976 and November 30, 1977 unless the I.C.C. should oppose CNW's financing plan. A Second Supplemental Agreement on January 30, 1978 cancelled the first supplemental agreement and provided that CNW must pay BN the obligations under the basic agreement, with interest, by obtaining bank loans and said that "When North Western shall have paid to Burlington Northern the sums specified . . . all terms of the Basic Agreement shall again become effective between the parties." In the meantime, BN was to acquire the right of way in its name, but upon such payment BN would convey to CNW its one-half interest therein. It then provided that "If by Nov. 30, 1979 . . . North Western shall not have made the payments required . . . North Western shall be deemed to have withdrawn from the Joint Line Project . . ." and provided for termination of CNW's rights and obligations therein.

CNW has not made the payments required by November 30, 1979, and BN has filed suit in the Minnesota courts seeking a declaration that CNW's rights in the joint line are terminated. We note in passing the allegation therein of BN that the I.C.C. has no jurisdiction, a position apparently contrary to that asserted here.

CNW on November 15, 1979 filed a petition to the Commission for an interlocutory order suspending and postponing the November 30, 1979 deadline for payment of its share of the construction costs of the new jointly owned railroad line. On November 30, 1979 the I.C.C. found it inappropriate to grant that relief and denied the petition, but asserted "continued jurisdiction" over the agreements as well as "reserved jurisdiction . . . over the joint construction, financing, ownership and operation of the new rail line . . . regardless of whether CNW pays its share of the construction costs by November 30, 1979." The Commission said that,

"As we have stated in our 1976 decision in Finance Docket No. 27579 we licensed *joint* construction, ownership, and operation of the new line by BN and C&NW; we did not license or approve sole ownership and operation by BN, although that option was specifically before us. Joint construction, ownership, and operation necessarily call for an agreement to govern their detailed functioning. If the present agreement fails, a new one must be entered into; and if the parties cannot voluntarily come to terms acceptable to the Commission, the terms must be arbitrated by the Commission in the public interest. In any event, C&NW cannot now be excluded from participation in the new lines without the Commission's ap-

proval, as this would directly contravene our earlier decision calling for joint construction, ownership and operation.

In short, C&NW's right to participate in the new line on terms conforming to the public interest will continue, regardless of whether or not it meets the November 30 deadline (in the parties private, but as yet, unapproved agreement) for payment of its share of the construction costs, unless and until we determine, on the basis of all the facts developed in the pending proceeding on C&NW's June 13, 1979 petition that such participation is no longer required by the public convenience and necessity."

Burlington and CNW have each filed Motions to Dismiss, asserting principally that the I.C.C. has exclusive jurisdiction of this matter. The Plaintiff then moved for summary judgment, but the Defendants asked that no consideration be given to summary judgment until the motion to dismiss had been heard, and the Court agreed. Consequently, the issues before the Court upon Defendants' motions to dismiss are, (1) whether I.C.C. has exclusive jurisdiction which would prohibit this Court from considering the effect of Defendants' territorial decision under the antitrust laws, (2) whether the doctrine of primary jurisdiction requires this Court to defer action until the I.C.C. acts upon the petition to approve the agreement, and (3) whether Title 49, Section 11705 of the Interstate Commerce Act permits damage suits by an aggrieved party against a regulated carrier.

■ Here, as in *S. S. W., Inc. v. Air Transport Ass'n of America*, 89 U.S.App. D.C. 273, 191 F.2d 658 (C.A.D.C.,1951), we are "called upon to consider the effect of the antitrust laws upon a regulated industry." Judge Bazelon pointed out in that case that,

"But, in view of the importance of the antitrust laws to the unregulated part of the economy, the rule has been developed that the mere existence of a regulatory statute does not result in complete withdrawal of the regulated industry from the operation of the antitrust laws. Such

repeals by implication are not favored. The antitrust laws have been held to be superseded by specific regulatory statutes only to the extent of the repugnancy between them."

Immunity from the antitrust laws is not lightly implied, and such repeals of them by implication from a regulatory statute are strongly disfavored. *United States v. Philadelphia Nat. Bank*, (1963) 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915. Only where there is a "plain repugnancy between the antitrust and regulatory provisions" will repeal be implied, *Gordon v. New York Stock Exchange*, (1975) 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463, and "then only pro tanto to the extent of the repugnancy." *Georgia v. Pennsylvania R. Co.*, (1945) 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051. Thus, it has been uniformly held, in the words of Justice Douglas in *Georgia v. Pennsylvania R. Co.*, supra, that "Regulated industries are not per se exempt from the Sherman Act," citing *U. S. v. Borden Co.*, 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181.

■ On October 17, 1978 Congress enacted the Revised Interstate Commerce Act, P.L. 95–473, "to restate in comprehensive form, without substantial change, the Interstate Commerce Act and related laws and to enact those laws as subtitle IV of Title 49, United States Code." 4 *U. S. Code Cong. & Admin. News*, 95th Congress, Second Session, 1978, House Report No. 95–1395, pp. 3009, 3013. Prior to that time the pertinent portions of the Act read:

*Title 49, Section 5(1):*

"Except upon specific approval by order of the Commission . . . it shall be unlawful for any common carrier . . . to enter into any contract, agreement or combination with any other such common carrier or carriers for the pooling or division of traffic, or of service, or of gross or net earnings, or of any portion thereof; . . . ."

*Title 49, Section 5c(2):*

"Any carrier which is a party to an agreement, between or among two or more carriers, relating to rates, fares, classification, divisions, allowances, or

charges . . . shall . . . apply to the Commission for approval of such agreement."

*Title 49, Section 5c(8)*:

"Parties to any agreement approved by the Commission under this section and other persons are, if the approval of such agreement is not prohibited by paragraph (4) or (5) of this section, hereby relieved from the operation of the antitrust laws with respect to the making of such agreement, and with respect to the carrying out of such agreement in conformity with its provisions and in conformity with the terms and conditions prescribed by the Commission."

*Title 49, Section 5(12)*:

"The authority conferred by this section shall be exclusive and plenary, . . and any carriers or other corporations, and their officers and employees and any other persons, participating in a transaction approved or authorized under the provisions of this section shall be and they are relieved from the operation of the antitrust laws and of all other restraints, limitations, and prohibitions of law, Federal, State, or municipal, insofar as may be necessary to enable them to carry into effect the transaction so approved or provided for in accordance with the terms and conditions, if any, imposed by the Commission, . . ."

These statutes now read as follows:

*Title 49, Section 11342(a)*:

"A common carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I, II, III of chapter 105 of this title may not agree or combine with another of those carriers to pool or divide traffic or services or any part of their earnings without the approval of the Commission . . . The Commission may approve and authorize the agreement or combination if the carriers involved assent to the pooling or division and the Commission finds that a pooling or division of traffic, service, or earnings—

(1) will be in the interest of better service to the public or of economy of operation; and

(2) will not unreasonably restrain competition.

(b) The Commission may impose conditions governing the pooling or division and may approve and authorize payment of a reasonable consideration between the carriers."

*Title 49, Section 10706(a)(2)(A)*:

"A rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission . . . that is a party to an agreement of at least 2 rail carriers or an agreement with a class of carriers referred to in subsection (c)(1)(B)–(E) of this section, . . shall apply to the Commission for approval of that agreement under this subsection. The Commission shall approve the agreement only when it finds that the making and carrying out of the agreement will further the transportation policy of section 10101 of this title . . . If the Commission approves the agreement, it may be made and carried out under its terms and under the conditions required by the Commission, and the Sherman Act (15 U.S.C. 1, et seq.), the Clayton Act (15 U.S.C. 12, et seq.), the Federal Trade Commission Act (15 U.S.C. 41, et seq.), . . . do not apply to parties and other persons with respect to making or carrying out the agreement . . ."

*Title 49, Section 11705(b)(2)*:

"A common carrier providing transportation subject to the jurisdiction of the Commission under subchapter I or III of chapter 105 of this title is liable for damages sustained by a person as a result of an act or omission of that carrier in violation of this subtitle."

*Title 49, Section 11341(a)*:

"The authority of the Interstate Commerce Commission under this subchapter is exclusive. A carrier or corporation participating in or resulting from a transaction approved by the Commission under thus subchapter may carry out the trans-

action, own and operate property, and exercise control or franchises acquired through the transaction without the approval of a State authority. A carrier, corporation, or person participating in that transaction is exempt from the antitrust laws and from all other law, including State and municipal law, as necessary to let that person carry out the transaction, hold, maintain, and operate property, and exercise control or franchises acquired through the transaction . . ."

It will be observed by comparison of these statutes that the amendments made in 1978 were few and the House Judiciary Committee Report, supra, shows them to have been made mostly for clarity. That single report constitutes the only legislative history of the 1978 Act that is available, but it leads the Court to believe that the 1978 amendments were not meant to change the relationship between the railroad regulatory statutes and the antitrust laws, as it had theretofore been defined by the courts. The Supreme Court, which surely had these statutes in mind, particularly what is now Title 49, § 11341(a), supra, held in *Georgia v. Pennsylvania R. Co.*, that, "These carriers are subject to the anti-trust laws," supra, 324 U.S. 456, 65 S.Ct. 725, 89 L.Ed. 1062, and went on there to say, "We can only conclude that they have no immunity from the anti-trust laws." Ibid, 324 U.S. 457, 65 S.Ct. 726, p. 1063. As to those sections upon which Defendants claim exclusivity, the statement in § 5(12), now § 11341(a), that "authority conferred by this section shall be deemed exclusive and plenary" was added in 1940 (54 Stat. 908, Ch. 722, Sec. 7), and the statement in § 5(1), now § 11342(a), that "Except upon specific approval by order of the Commission as in this section provided . . ." was added by Congress in 1920 (41 Stat. 480, Ch. 91, Sec. 407), both prior to the Court's foregoing decisions. We must therefore conclude that Congress intended (as the Supreme Court has held) to give the railroads only a limited antitrust exemption.

▮ If the Commission had already given final approval of the agreement in question here, then there would be no doubt that the Commission's jurisdiction under the foregoing statutes would be exclusive. In an analogous situation, construing the Shipping Act of 1916, the Supreme Court in *Federal Maritime Comm. v. Seatrain Lines, Inc.*, 411 U.S. 726, 93 S.Ct. 1773, 36 L.Ed.2d 620, held that the Federal Maritime Commission had the power to shield from antitrust attack those agreements approved by it, taking antitrust privileges into account in making its decision, but that "if such contracts are not approved by the Commission, the antitrust laws are fully applicable to them." Finally, Title 49, § 11341(a) expressly provides that, "a carrier . . . participating in *that transaction* is exempt from the anti-trust laws . . ." and the preceding sentence of the section defines "that transaction" as "a transaction approved by the Commission under this subchapter."

But, here we have an agreement and two supplemental agreements never approved by the Commission. *I. C. C. Decision*, Fin. Docket No. 29066F, November 30, 1979. Although the I.C.C. has had a copy of it for 4 years, it has neither approved nor disapproved of it, nor has either of the Defendants ever asked it to do so until CNW did on June 13, 1979, seeking review of it under § 11344, after the commencement of this action. BN, while refusing (according to CNW) to join the application, filed an answer in support of the application—a position that now seems strangely inconsistent with its present one that CNW has withdrawn from the agreement and has breached it (Coyne Affidavit, December 6, 1979). Now, in its November 30, 1979 decision the I.C.C. says " . . . plainly some considerable time must elapse before the matter becomes appropriate for final decision." Ibid, p. 4. In the months and years between signing the agreement and formally presenting it to the Commission, and in the months or perhaps even years, between presentation and the Commission's final decision, does the Commission have exclusive jurisdiction over the unapproved agreement, or do the Courts under the antitrust laws have authority to strike down that

agreement which at least on first reading appears that it may be a *per se* violation of the Sherman Act under *U. S. v. Topco*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515, holding that horizontal restraints are naked restraints without purpose except stifling competition? Should the antitrust laws be permitted to be apparently violated pending I.C.C. action? Must the public's interest in lower energy costs, reduced by competition of carriers, be obliged to wait on the slowly-grinding wheels of the federal bureaucracy? Surely not. We cannot believe that no remedy exists except that of the Commission which even now shows no particular interest in expediting the matter.

Chief Justice Warren's decision in *Carnation Co. v. Pacific Westbound Conference*, 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966), is persuasive:

> "The creation of an antitrust exemption for rate-making activities which are lawful under the Shipping Act implies that unlawful rate-making activities are not exempt." 383 U.S. at 217, 86 S.Ct. at 784.

Chief Justice Warren, in noting that the Supreme Court had so interpreted an analogous provision of the Agricultural Marketing Agreement Act of 1957 exempting market agreements from the antitrust laws, quoted with approval the statement of *U. S. v. Borden Co.*, supra, that, "If Congress had desired to grant any further immunity Congress doubtless would have said so." In this case Congress certainly could have done so in the 1978 revision of the Interstate Commerce Act, but instead merely restated without substantial change its former provisions.

While the Court in *Carnation* was interpreting the Shipping Act, a statute virtually identical to the Interstate Commerce Act, it unanimously held that Congress,

> ". . . really only wanted to give the shipping industry a limited antitrust exemption. We do not believe that its purpose would be frustrated by the application of the antitrust laws to the implementation of conference agreements which have not been subjected to public

scrutiny and examination by a governmental agency." 383 U.S. at 219, 86 S.Ct. at 785.

In *Pan American World Airways, Inc. v. U. S.*, 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963), the Court said that it has never held that the 1887 Interstate Commerce Act had implicitly repealed the 1890 Sherman Act as to railroads' anticompetitive unapproved conduct.

More recently, in *Otter Tail Power Co. v. U. S.*, 410 U.S. 366, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973) the Court again said that repeals of the antitrust laws by implication are strongly disfavored and held that,

> "Activities which come under the jurisdiction of a regulatory agency nevertheless may be subject to scrutiny under the antitrust laws." 410 U.S. at 372, 93 S.Ct. at 1027.

That theme runs through the more recent decisions of the Court in this field. We think that it represents the current view of the Court, rather than that of *Terminal Warehouse Co. v. Pa. Ry. Co.*, 297 U.S. 500, 56 S.Ct. 546, 80 L.Ed. 827 (1936), which if not expressly overruled in *Carnation* has been ignored and certainly not reinforced by later decisions. See also concurring opinion, Justices Stewart and Brennan, in *Gordon v. N. Y. Stock Exchange*, 422 U.S. 659, at 692, 95 S.Ct. 2598, at 2616, 45 L.Ed.2d 463, at 485 (1975).

Finally, in *Chicago & North Western Railway Co. v. Peoria & Pekin Union Railway Co.*, 201 F.Supp. 241 (S.D.Ill.1962), affirmed 319 F.2d 117 (7th C.A.1963), cert. den. 376 U.S. 929, 84 S.Ct. 658, 11 L.Ed.2d 627 (1964), the Defendant (CNW, as in the case here), successfully contended that an unapproved market division agreement violated both the Interstate Commerce Act and the Sherman Act. In its Respondent's brief, p. 7, in the United States Supreme Court opposing a writ of certiorari, CNW said:

> Petitioner's assertion (Petition of P&PU at p. 10) that "the decision below . . usurped the (Interstate Commerce) Commission's exclusive and plenary authority . . ." is a glaring mistatement. On

the contrary, while I.C.C. could well have approved pooling under Section 5(1) in the 1946 proceeding, no such approval was sought by P&PU or even considered by the Commission. . . .

and then concluded:

Since the contract had never been presented to I.C.C. for approval under Section 5(1) (now 49 U.S.C. § 11342), *this pooling was clearly unlawful under the statute, a result ordained by every prior judicial or agency decision and the legislative history of the Act. The lower courts were clearly correct in thus disposing of this question,* and no question of significance warrants further review. Thus, on the pooling aspect of the case alone, these many decisions would warrant even summary affirmance of the lower courts here. (Emphasis supplied).

The position of CNW then and now is obviously inconsistent. We think CNW, and the 7th Circuit, were right in the so-called "P&PU" case, supra. Defendants urge that the doctrine of primary jurisdiction, requiring judicial abstention to permit resort to the administrative agency charged with administration of the regulatory plan, mandates, dismissal of this action, lest the exercise of jurisdiction interfere with the uniform treatment of the railroads or deprive the I.C.C. of the opportunity to analyze those problems, relying on *U. S. v. Western Pacific Railway Co.,* 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). That case dealt with tariff classifications and rates, not with agreements for pooling or division of traffic. This doctrine is applicable where a claim is originally cognizable in the courts, *U. S. v. Western P. R. Co.,* 352 U.S. at 64, 77 S.Ct. 161, a point somewhat at variance with the Defendants' other jurisdiction argument. The Supreme Court then holds that if (1) the question demands the exercise of administrative discretion requiring the special knowledge, experience and services of the administrative tribunal to determine technical and intricate matters of fact, and (2) uniformity of ruling is essential to comply with the regulatory statute, then the power is transferred from the courts to the agency to determine the incidents of such relations.

Here these threshold questions do not confront us. The courts rather than the I.C.C. usually are the tribunals where the antitrust laws are enforced. The I.C.C. will, of course, recognize and apply such laws, and therefore will reach the same result, whatever that may be. Also, in adjudication of the issues of this case, the Court of course will not attempt to direct in any way the adjudication of issues such as territorial division, or the joint operations of the carriers on this railroad line. These are all matters for the exclusive decision of the I.C.C., and they are very different issues than those confronting us here, where the question is whether or not an unapproved agreement violates the Sherman Act and, if so, what if any damages the Plaintiff may have sustained, i. e., the consequences of an unapproved territorial restriction between two carriers.

Here the I.C.C. has known of this agreement since 1975. It was filed formally in 1979, although approval was not sought by CNW under § 11342. Its decision of November 30, 1979 hints that it may be many months until it acts, if it does. Although BN has consented to approval of it by the I.C.C., it has contrariwise asserted that the agreement has been terminated and, if so, BN may endeavor to delay or prevent I.C.C. proceedings to approve it. It may never be considered or approved or disapproved. Yet, in the meantime, the Defendants are said to be complying with the territorial decisions agreement. We cannot believe that in the years since 1975 and in the months between now and the time the Commission may act on the agreement, if it ever does, that the hands of the courts must be tied and the Plaintiff and public be left without a remedy. This Court in fact has stayed its decision on this matter many weeks to see if the I.C.C. would not, and it has not. Seven months now have elapsed since the June 1979 filing—an ample time for administrative action. Under those circumstances there is no reason for this Court to defer any longer to the Commission. The doctrine of primary jurisdiction is not applicable.

Having concluded that this Court has jurisdiction to entertain this suit and that the Interstate Commerce Commission's jurisdiction is not exclusive, it is

ORDERED that Defendants' Motion to Dismiss be overruled. Defendants shall answer Plaintiff's complaint within twenty (20) days from this date, and shall respond to the Plaintiff's Motion for Summary Judgment by filing their counter-affidavits and briefs herein on or before February 14, 1980.