**In re OCEAN SHIPPING ANTITRUST LITIGATION.**

MDL No. 395

M21–26 (CES).

United States District Court,
S. D. New York.

Oct. 15, 1980.

Brien E. Kehoe, Gen. Counsel, Edward G. Gruis, Deputy Gen. Counsel, Washington, D. C., Anne E. Mickey, Atty., Federal Mari-

time Commission, New York City and Washington, D. C., for Federal Maritime Commission.

Kenneth N. Hart, Donovan, Leisure, Newton & Irvine, New York City, for defendant United States Lines, Inc.

Robert A. Skirnick, Wolf, Popper, Ross, Wolf & Jones, New York City, for plaintiffs Covington Fabrics Corp., Graphic Engraving, Inc., Hanbury Import Corp., L&H Export Industries, Inc., and Thrift Control Products, Inc.

James R. Hawkins, II, Cummings & Lockwood, Stamford, Conn., for defendant American Export Lines, Inc.

William Karas, Galland, Kharasch, Calkins & Short, George W. Wise, Hogan & Hartson, Washington, D. C., for defendant Atlantic Container Line, Ltd.

Edwin Longcope, Hill, Betts & Nash, New York City, for defendant Dart Containerline Co. Limited.

Stanley O. Sher, Billig, Sher & Jones, Washington, D. C., for defendant Hapag–Lloyd, A. G.

John C. Fricano, Skadden, Arps, Slate, Meagher & Flom, Washington, D. C., for defendant Sea–Land Service, Inc.

Jane E. Genster, Williams & Connolly, Washington, D. C., for defendant Seatrain Lines, Inc.

Samuel K. Rosen, Skydell Sigall Rosen & Windheim, P. C., New York City, for plaintiff Amrose Art Linens, Inc.

Harvey S. Kronfeld, Hudson, Wilf & Kronfeld, Philadelphia, Pa., for plaintiff Bonjour Imports Corp.

Benedict Wolf, Wolf, Popper, Ross, Wolf & Jones, New York City, for plaintiffs Covington Fabrics Corp., Graphic Engraving, Inc., Hanbury Import Corp., L&H Export Industries, Inc., and Thrift Control Products, Inc.

Abraham A. Diamond, Abraham A. Diamond, Ltd., Chicago, Ill., for plaintiff C.S. Greene and Co., Inc.

Michael H. King, Antonow & Fink, Chicago, Ill., for plaintiff A. Epstein Companies, Inc.

Michael J. Freed, Much, Shelist, Freed, Deneberg, Ament & Eiger, Chicago, Ill., for plaintiff Euromarket Designs, Inc.

Robert Dembia, Purrington & McConnell, New York City, for plaintiffs Fruitex Corp., M. Trombetta & Sons, Inc., H. Schnell & Co., Inc., and Fruit Export Corp.

Joseph A. Ruskay, Woodmere, N. Y., for plaintiffs Galland–Schlesinger Chemical Manufacturing Corp. and Galland–Schlesinger Chemicides, Inc., and Hobrel Export Corp.

Lawrence Walner, Chicago, Ill., for plaintiff Domino Footwear, Ltd.

Robert N. Kaplan, Kaplan, Kilsheimer & Foley, New York City, for plaintiff Dunhill Manufacturing & Distributing Corp.

Elwood Kendrick, Kendrick, Netter & Bennett, Los Angeles, Cal., for plaintiff Walter Hausfeld, T/A Walter Hausfeld Co.

Lawrence H. Eiger, Much, Shelist, Freed, Deneberg, Ament & Eiger, Chicago, Ill., for plaintiff Howard Footwear Enterprises, Inc.

Guido Saveri, Saveri & Saveri, San Francisco, Cal., for plaintiff Gary Wine & Liquor Corp.

Stanley L. Kaufman, Kaufman, Taylor, Kimmel & Miller, New York City, for plaintiff Glass Laboratories, Inc.

Bernard M. Gross, Gross & Sklar, P. C., Philadelphia, Pa., for plaintiff Michael Koretsky T/A Frames Unlimited.

N. Robert Stoll, Stoll & Stoll, Portland, Or., for plaintiff London Antique Wholesalers, Ltd.

Henry A. Brachtl, Lowey, Dannenberg & Knapp, New York City, for plaintiffs IAP, Inc., Imported Automotive Parts, Ltd. and Great Empire Corp.

Jerry S. Cohen, Kohn, Milstein & Cohen, Washington, D. C., for plaintiff Imperial Crystals and China Co., Inc.

Eric M. Rubin, Wolf, Block, Schorr & Solis–Cohen, Washington, D. C., for plaintiff Imperial Metal & Chemical Co.

Stuart A. Summit, Burns, Jackson, Miller, Summit & Jacoby, New York City, for

plaintiffs Packaging Industries Group, Inc. and Mercantile Development, Inc.

James B. Sloan, Sloan & Connelly, P. C., Chicago, Ill., for plaintiff Palacek Imports, Inc.

Sheldon P. Barr, Barr & Bello, New York City, for plaintiff Paramount Electrical Supply Co., Inc.

Anthony L. Tersigni, Meyers, Tersigni, Kaufman, Debrot, Feldman & Gray, New York City, for plaintiff Indecor, Inc.

H. Kenneth Kudon, Danzansky, Dickey, Tydings, Quint & Gordon, Washington, D. C., for plaintiff Selfix, Inc.

Leonard Barrack, Barrack, Rodos & McMahon, Philadelphia, Pa., for plaintiff Starmel Food Corp.

Dale E. Fredericks, Sedwick, Detert, Moran & Arnold, San Francisco, Cal., for plaintiff Tacony Corp.

Sheldon O. Collen, Friedman & Kovan, Chicago, Ill., for plaintiff The Testor Corp.

David Berger, Berger & Montague, P. C., Philadelphia, Pa., for plaintiff Pat Harris of New Jersey, Inc.

Arthur N. Abbey, New York City, for plaintiff Regent Sheffield, Ltd.

Daniel W. Krasner, Wolf, Haldenstein, Adler, Freeman & Herz, New York City, for plaintiff Trans–Ocean Sales Co., Inc.

Richard J. Rappaport, Ross, Hardies, O'Keefe, Babcock & Parsons, Chicago, Ill., for plaintiff T. I. Raleigh (U. S. A.), Inc.

## MEMORANDUM DECISION

STEWART, District Judge:

Plaintiffs, shippers in the United States/Europe ocean shipping trade, brought these actions under section 4 of the Clayton Act, 15 U.S.C. § 15 seeking damages for injuries sustained as a result of violations by defendants of section 1 of the Sherman Act, 15 U.S.C. § 1.[1] They seek relief on behalf of themselves and all United States shippers by common carrier in the United States/Europe trade during the period 1971 through a certain time in 1977.

Defendants are common carriers engaged in ocean transportation of freight for hire, serving the United States/Europe trade. As such, they are subject to regulation by the Federal Maritime Commission ("FMC" or "Commission") under the Shipping Act of 1916, as amended, 46 U.S.C. § 801 et seq., 1976.

Plaintiffs allege that, beginning in 1971 and continuing until sometime in 1977, defendants participated in a conspiracy consisting of a continuing agreement to fix, raise, maintain and stabilize price levels for the shipment of freight in the United States/Europe trade. Plaintiffs further allege that the agreement was not approved by the Commission and was not authorized or permitted by existing agreements that had been approved by the FMC.

■ Under the Shipping Act, any agreement among carriers engaged in ocean transportation of freight fixing rates or fares or in any manner providing for an exclusive, preferential or cooperative working arrangement must be filed with the FMC, 46 U.S.C. § 814. The Commission is required to disapprove agreements that are:

> unjustly discriminatory or unfair as between carriers, shippers, ... or operate to the detriment of the commerce of the United States, or [are] ... contrary to the public interest, or ... [are] in violation of the [act].

It is required to approve all other agreements subject to its jurisdiction. 46 U.S.C. § 814. An agreement approved by the Commission is excepted from the antitrust laws. Before approval or after disapproval, however, the agreement is subject to antitrust laws. *Id.*

Defendants have moved to dismiss the complaints or, in the alternative, to stay the action pending an investigation and determination by the Commission, pursuant to the doctrine of primary jurisdiction. The Commission has moved to intervene and for a stay of this proceeding.

---

1. Pursuant to an order of the Judicial Panel on Multidistrict Litigation, these cases have been transferred to us for coordinated or consolidated pretrial proceedings under 28 U.S.C. § 1407. Plaintiffs have filed a motion for class certification which is currently pending in this court.

## I

The facts and circumstances leading to these motions, as set forth in the parties' pleadings, are as follows: As of 1972, the FMC had approved seven conference agreements, three rate agreements, and a number of cooperative working agreements, of which each of the defendant lines were a member for some relevant period.[2] In 1969 defendant lines filed with the FMC the "Transatlantic Freight Conference," FMC Agreement 9813. The proposed "super–conference" allegedly would have established one conference with authority to fix rates, charges and practices for the United States/Europe trade. In 1971, the parties withdrew the proposed agreement. In 1977, eight conferences covering the United States/Europe trade, of which defendants were members, filed a proposed agreement, called the Bridge Agreement, to take joint interconference action on such matters as rates and charges for transportation of cargo, costs of providing transportation of cargo, and collection, preparation and dissemination of data or reports. The Bridge Agreement was disapproved by the FMC in March of 1978. The carriers appealed the FMC's order of disapproval on procedural grounds. The FMC determined, based on a recent Court of Appeals decision, that their procedures would not be found to meet due process requirements set forth in *U.S. Lines v. FMC*, 584 F.2d 519 (D.C.Cir.1978). The FMC them moved to remand the case for further proceedings, and the Court of Appeals granted this motion. The carriers then withdrew their proposed agreement, and pursuant to court order, the FMC vacated the proceedings and dismissed the case as moot.

On June 1, 1979, a federal grand jury in the District of Columbia returned indictments against the defendants charging that they entered into several agreements and understandings not approved by the FMC during the years 1971 through 1975 "to fix, raise, stabilize and maintain price levels for the shipment of freight in the United States/Europe trade." D.C.Crim. No. 79–00271, §§ 33, 34. The defendants pleaded nolo contendere to the indictments on June 8, 1979, and large fines were assessed.

Following the judgment in the criminal actions, the instant civil actions were filed and consolidated before us for pretrial proceedings.[3] On August 14, 1979, the FMC served an Order of Investigation naming the seven defendants and their conferences as "respondents" and directing that a hearing be held to investigate the charges contained in the indictment. Investigation of Unfiled Agreements in the North Atlantic Trades, FMC Docket 7983.

## II

■ The FMC, by its General Counsel's Office, moves to intervene in this action, pursuant to Rule 24(a)(2) and Rule 24(b)(2), F.R.Civ.P. Plaintiffs move to strike the Commission's motion to intervene, or in the alternative, to deny intervention. The Office of the Attorney General, not a party to this action, has submitted a letter to the Court asserting that the Commission is without authority to move independently to intervene without the authorization or consent of the Department of Justice, that no such authorization or consent was granted, and that the Court should therefore strike the pleadings of the Commission.

Plaintiffs and the Attorney General rely on 28 U.S.C. §§ 516 and 519 as the basis for their motions to strike. Section 516 of Title 28 provides:

Except as otherwise authorized by law, the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, and securing evidence therefor, is reserved to

---

2. A conference is an association of common carriers which usually provides for fixing of uniform rates and practices within the specified trade, the filing of a common tariff, and the appointment of a chairman to conduct the administrative affairs of the parties. 46 C.F.R. § 522.2(a)(1). A rate agreement is a similar arrangement which is not expected to become a dominant factor in United States commerce in the trade specified in the agreement. 46 C.F.R. § 522.2(a)(3).

3. Plaintiffs have filed a united and consolidated amended complaint, hereinafter referred to as "the complaint".

officers of the Department of Justice, under the direction of the Attorney General.

Section 519 of Title 28 provides:

Except as otherwise authorized by law, the Attorney General shall supervise all litigation to which the United States, an agency, or officer thereof is a party . . . .

Courts have construed these provisions strictly, see *Federal Trade Commission v. Guignon*, 390 F.2d 323 (8th Cir. 1968); *United States v. Daniel, Urbahn, Seelye and Fuller*, 357 F.Supp. 853 (N.D.Ill.1973), and have held that, unless otherwise provided by law, the Attorney General has plenary power and supervision over all federal government litigation, including litigation involving the regulatory agencies. *I.C.C. v. Southern Railway Co.*, 543 F.2d 534, 535 (5th Cir. 1976); *Hughes Aircraft Co. v. U.S.*, 534 F.2d 889, 900 (Ct.Cl.1976).

The Commission does not claim that a specific statutory provision exempts it from 28 U.S.C. §§ 516 and 519. Rather, the Commission argues that its motions are not within the scope of these sections because they were filed "for the limited purpose of protecting and preserving its jurisdiction under section 15". Reply Brief of FMC, p. 7.

We are not persuaded that the relevant provisions support the distinction urged by the Commission. The determination of a motion to stay the litigation is part of the conduct of this litigation. Moreover, 28 U.S.C. § 516 specifically reserves to the Department of Justice litigation in which an agency is "interested". There is no statutory basis for the distinction offered by the Commission.

The Commission also argues that there are policy reasons pertaining to questions of conflict of interest, the appearance of prejudgment and primary jurisdiction, which offer additional bases for the inapplicability of 28 U.S.C. §§ 516 and 519. As the Court stated in *F.T.C. v. Guignon, supra,* "we believe that such fundamental policy consider-

ations concerning possible disagreement between federal agencies are best resolved by legislative action". *Id.* at 330. We also note that these sections merely restate "the traditional responsibility of the Attorney General over the conduct of all litigation on behalf of the United States and its agencies. (citations omitted) The principle not only centralizes responsibility for the conduct of public litigation but enables the President, through the Attorney General, to supervise the various policies of the executive branch. The alternative would allow a proliferation of policies among and within the various agencies". *I.C.C. v. Southern Railway Co., supra,* at 536.

In sum, we hold that the Commission was without authority to move to intervene in this action, and order that this motion be stricken. We will, however, treat the Commission as amicus curiae, and consider their views concerning the appropriateness of a stay pending its hearing and investigation. We now turn to defendants' motions.

### III

Defendants move to dismiss the complaints, claiming that under the Shipping Act's tariff provisions, section 18(b), 46 U.S.C. § 817(b), the Commission has exclusive jurisdiction over ocean shipping rates so that all rate–fixing activities by ocean carriers have implied immunity from the antitrust laws.[4] They base their position on the principle that, where there is a "plain repugnancy" between the antitrust laws and a federal regulatory scheme, the Court will imply immunity from the antitrust laws. *United States v. Philadelphia National Bank*, 374 U.S. 321, 350–51, 83 S.Ct. 1715, 1734–1735, 10 L.Ed.2d 915 (1963). Defendants, relying primarily on *Keogh v. Chicago & Northwestern Railway Co.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922), argue that antitrust claims by shippers for damages resulting from price–fixing by ocean carriers are inconsistent with the tar-

4. 46 U.S.C. § 817 requires ocean carriers to file maximum rates, fares and charges, tariffs showing all rates and charges of such carrier and places between which freight will be carried. No change in rates, charges, etc. shall be made except by the filing of a new tariff, and carriers are required to charge the rates and charges specified in the tariff.

iff filing system created by Congress in the 1961 amendments to the Shipping Act.

The Supreme Court addressed the issue of whether the Shipping Act of 1916, as amended, precludes the application of the antitrust laws to the shipping industry in *Carnation v. Pacific Westbound Conference,* 383 U.S. 213, 86 S.Ct. 781, 15 L.Ed.2d 709 (1965). In that case, the petitioner, a shipper in foreign commerce, filed an antitrust treble damages action against two conferences of shipping companies operating between the western United States and the Philippines. Petitioner alleged that Pacific Westbound Conference initiated and maintained a rate increase to implement certain rate–making agreements between the two conferences which had not been approved by the FMC. Petitioner claimed that such unapproved agreements were unlawful *per se* under the antitrust laws. Respondents moved to dismiss, claiming that the Shipping Act repealed all antitrust regulation of rate–making activities. The Court held that "the implementation of rate–making agreements which have not been approved by the Federal Maritime Commission is subject to the antitrust laws." *Id.,* 383 U.S. at 216, 86 S.Ct. at 783. Noting that the Shipping Act explicitly exempts from the antitrust laws activities which are lawful under section 15 of the Act, the Court found that "[t]he creation of an antitrust exemption for rate–making activities are not exempt.... 'If Congress had desired to grant any further immunity, Congress doubtless would have said so.' (citations omitted)".

Defendants assert that *Carnation* is not controlling because section 18(b) containing the tariff filing provisions of the Shipping Act was not in effect at the time the activities challenged in *Carnation* took place, and thus was not considered in the *Carnation* opinion. They urge that this case is controlled by *Keogh,* in which the Court held that a manufacturer had no right to bring a private antitrust action against a railroad company for damages caused by an alleged arbitrary and unreasonable increase in rates resulting from a committee of railroad companies.

We disagree. The *Carnation* Court in its opening paragraph stated that the issue at hand concerned the Shipping Act of 1916, "*as amended,* 75 Stat. 762, 46 U.S.C. §§ 801–842 (1964 ed.)". (emphasis added) The opinion refers to language in the Act as amended in 1961, 383 U.S. at 216 n. 1, 86 S.Ct. at 784 n. 1. As plaintiffs point out, there is some indication that respondents' activities in *Carnation* continued into the period during which the new statutory scheme took effect. Thus, we are not convinced that there is reason to limit the application of *Carnation* to the Shipping Act prior to the 1961 amendments. Since *Carnation,* other district courts have addressed the question of whether rate–making activities under the Shipping Act are exempt from the antitrust laws and found that *Carnation* was controlling. *See Sabre Shipping Corp. v. American President Lines, Ltd.,* 285 F.Supp. 949 (S.D.N.Y.1968), *cert. denied sub nom. Japan Line Ltd. v. Sabre Shipping Corp.,* 395 U.S. 922, 89 S.Ct. 1774, 23 L.Ed.2d 239 (1969); *Retla Steamship Co. v. Pan Ocean Bulk Carriers, Ltd.,* 1979–2 Trade Cases ¶ 62,819 (C.D.Cal.1979).

Moreover, we are not persuaded that the amendment of the Shipping Act to include a tariff filing system represented a fundamental change in Congress' accommodation of the Shipping Act and the antitrust laws, as urged by the defendants. As the court noted in *U.S. v. Philadelphia National Bank,* "[r]epeals of the antitrust laws by implication are strongly disfavored, and have only been found in cases of plain repugnancy between the antitrust laws and regulatory provisions." *U.S. v. Philadelphia National Bank, supra,* 374 U.S. at 350–51, 83 S.Ct. at 1734–1735. To determine the applicability of the Sherman Act to a regulated industry, courts must consider whether and to what extent Congress intended to exempt activities of that industry from the antitrust laws. This can be determined through an examination of the legislative history and the administrative scheme itself.

The Shipping Act of 1916 specifically provides that agreements between carri-

ers that have been approved by the FMC are exempt from the antitrust laws. "This express provision covers approved agreements, but does not apply to the implementation of unapproved agreements, which is specifically prohibited by § 15 of the Shipping Act." *Carnation, supra,* 383 U.S. at 216, 86 S.Ct. at 783–784. The Court went on to explore the legislative history of the 1916 Act, noting that "[t]he Congress which enacted the Shipping Act was not hostile to antitrust regulation . . . . It seems likely that the Committee really only wanted to give the shipping industry a limited antitrust exemption." *Id.* 383 U.S. at 218, 219, 86 S.Ct. at 784–785. Finally, the Court considered the antitrust implications of the explicit exemption provided in § 15, and concluded that it clearly demonstrates that:

> the language of that provision must have been selected as a matter of deliberate choice in order to indicate the extent to which the industry's rate–making activities remain subject to the antitrust laws as well as the extent to which these activities are exempted from antitrust regulation.

*Id.* 383 U.S. at 220, 86 S.Ct. at 785–786.

There is nothing in the legislative history of the 1961 amendments which in anyway alters this assessment of Congress' intent. Indeed, as plaintiffs point out, the 1961 amendments added to the antitrust immunity provision agreements permitted under § 813a. No such exemption was provided for § 817(b), the tariff filing provision.

Defendants argue that the enactment of the tariff filing provision is sufficient to bar private treble damages actions because the filed tariff establishes the "legal rights of shipper as against carrier". *Keogh, supra,* 260 U.S. at 163, 43 S.Ct. at 49–50. By focusing solely on the tariff filing provision in isolation from the entire statutory scheme, defendants lose sight of the principles guiding courts in determining immunity from antitrust laws. If the existence of a tariff filing system were a touchstone of determining immunity from the antitrust laws, it would be difficult to abide by the well established principle that repeal of the antitrust laws is not favored and not casually allowed. *See Philadelphia National*

*Bank, supra,* 374 U.S. at 348, 83 S.Ct. at 1733. Indeed, the Supreme Court has stated that the filing of a tariff is not a sufficient basis for implying an exception from the federal antitrust laws. *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 598, 96 S.Ct. 3110, 3121, 49 L.Ed.2d 1141 (1976). *See Litton Systems, Inc. v. American Telephone and Telegraph,* 487 F.Supp. 942 (S.D.N.Y. 1980).

In our view, the existence of the tariff filing system is not repugnant to the antitrust laws. Courts have limited their exemptions from antitrust laws to industries where the regulatory agency controls and aggressively exercises the power of review. *Hughes Tool Co. v. Trans World Airlines,* 409 U.S. 363, 385, 93 S.Ct. 647, 660, 34 L.Ed.2d 577 (1973). The FMC wields relatively weak power to supervise tariffs. Unlike in *Keogh,* the regulatory agency here has not determined that the challenged rates are reasonable. Finally, it is not clear that the FMC is empowered to provide the type of relief sought in this litigation. *See* 46 U.S.C. § 817. We note that the FMC has taken the position that no immunity is conferred other than that specified in § 15.

In sum, we find that the implementation of unapproved agreements, including activities involving the establishment of rates that are filed as tariffs, is not immune from the antitrust laws. Accordingly, defendants' motion to dismiss is denied.

## IV

■ Defendants alternatively move to stay this litigation pending investigation and determination by the FMC, based on the doctrine of primary jurisdiction. The FMC has also submitted papers supporting a stay.

The doctrine of primary jurisdiction, first articulated in *Texas & Pacific R. Co. v. Abilene Cotton Oil Co.,* 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907), reflects courts' concern that "in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the sub-

ject matter should not be passed over". *Far East Conference v. United States*, 342 U.S. 570, 574, 72 S.Ct. 492, 494, 96 L.Ed. 576 (1951).

> It was grounded on the necessity for administrative uniformity .... A second reason for the doctrine was suggested by Mr. Justice Brandeis in *Great Northern R. Co. v. Merchants Elevator Co.*, 259 U.S. 285, 291, 42 S.Ct. 477, 479, 66 L.Ed. 943 where he pointed to the need for administrative skill 'commonly to be found only in a body of experts' in handling the 'intricate facts' of, in that case, the transportation industry.

*U.S. v. R.C.A.*, 358 U.S. 334, 346, 79 S.Ct. 457, 464–465, 3 L.Ed.2d 354 (1959).

The Supreme Court has applied these principles in several cases involving the Shipping Act, see *Carnation, supra, Far East Conference v. U.S.*, 375 U.S. 813, 84 S.Ct. 51, 11 L.Ed.2d 48; *U.S. Navigation Co. v. Cunard Steamship Co., supra*. In *Carnation*, the Court determined that a stay was appropriate when, in the Court's view, the conduct in question was arguably lawful under the Shipping Act. *Id.* 383 U.S. at 222, 86 S.Ct. at 787.

Defendants contend that the challenged conduct was arguably legal, and therefore *Carnation* and its progeny dictate that we defer judicial proceedings to permit the FMC to exercise its primary jurisdiction. Recent primary jurisdiction decisions indicate that "arguable legality" was not intended as a rigid, absolute standard to be automatically applied whenever defendants assert that the conduct was within the scope of approved Section 15 agreements. Rather, the Court must consider the standard in the context of the specific facts and circumstances of the case and the policies justifying the exercise of primary jurisdiction. *See Breen Air Freight, Ltd. v. Air Cargo Inc.*, 470 F.2d 767 (2d Cir. 1972); see generally *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976).

Thus, we must first consider whether defendants have presented a factual basis to support the conclusion that the activities in the complaint were conceivably covered by an approved agreement. Defendants urge that the fact that they have raised the question of arguable legality is sufficient to require referral to the FMC. We disagree. The task of determining whether defendants' activities could conceivably be within the scope of approved agreements is well within the competence of a court. Indeed, in *Carnation*, the Court of Appeals engaged in this very process before arriving at the conclusion, affirmed by the Supreme Court, that the challenged conduct was arguably lawful. *Carnation Co. v. Pacific Westbound Conference*, 336 F.2d 650, 664–66 (9th Cir. 1964).

Defendants assert that the approved agreements allowing joint action in the pertinent trades arguably authorized the concerted actions alleged in the complaint. In their memo in support, they do not point to any particular provision in any of the approved agreements authorizing interconference rate setting or other activities alleged in the complaint. Rather, they "believe that it will be found that the rate–setting authority created by the approval of the agreements discussed above fully covers and immunizes their alleged conduct." Defendants' memo, page 40. The one provision in the NAWFA agreement specifically referred to by defendants does not on its face authorize the rate–making agreements alleged in the complaint.[5]

We are not persuaded by defendants' assertion that the Supreme Court in *Carnation* itself applied primary jurisdiction to exactly the situation here. Unlike our situation, in *Carnation* the Court was presented with agreements which specifically provided "that certain actions should be determined only by a concurrence of the two groups with respect to the establishment of rates". *Carnation, supra*, 336 F.2d at 665. In that situation, where it is "plain that the

5. The statement, contained in a cooperative working agreement, is as follows: "This Association shall endeavor, by consultation with the

other North Atlantic Freight Conferences, to stabilize rates in these trades, and, in so far as possible, to provide for parity of rates."

joint action was provided for in an approved agreement," the determination of arguable legality required such specialized determinations as whether there was a waiver of the independent action provision. *Id.*, 336 F.2d at 666. Under these circumstances, the Court of Appeals found that there were "questions of an exceptional character the solution of which may call for the exercise of a high degree of expert and technical knowledge." *Id.*

Similarly, in *Marine Terminal v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 91 S.Ct. 203, 27 L.Ed.2d 203 (1970), the challenged activity—establishment of a revised tariff—was provided for in the general language of an approved conference agreement which set out the basic scheme for protected price fixing by its members.

In contrast, defendants in the instant case assert in effect that the FMC could find that the whole of the approved agreements is greater than the sum of its parts. Based on the agreements and defendants' contentions, the activities alleged in the complaint do not appear to be within the scope of the approved agreements. The language of the agreements does not appear to provide for inter–conference rate making, joint management of inter–conference activities, or the other activities listed in the complaint. Rate making and other joint activities appear to be authorized only for the trades covered by each agreement. Furthermore, this question is not one that requires the special expertise of the FMC, such as whether there are special circumstances concerning the shipping industry which warrant exemption of inter–conference activities from the antitrust laws. Nor are we determining at this time whether the activities alleged in the complaint actually occurred. Rather, the issue at hand requires us to apply the language of

the agreements to particular transactions, a task well within the competence of courts.

We also note that the FMC's primary concern reflected in its papers in support of the stay is preserving the option of taking future action with respect to defendants' activities. In our view, the denial of a stay here of these actions does not restrict the FMC for the future.

Nor do we think that referral is warranted by the possibility of conflicting results. The plaintiffs do no seek injunctive relief. *Compare U.S. Navigation Co. v. Cunard S.S. Co., supra*; *Far East Conference v. U.S., supra*. As we have discussed above, the agreements do not appear to cover the challenged activities. Moreover, although there has been no binding determination by the FMC,[6] actions and statements of the agency such as those made in seeking the grand jury documents and in their comments on the Bridge Agreement, indicate a view that defendants' alleged activities were not within the scope of approved agreements. The FMC will have the opportunity as amicus to inform the Court of its position on matters that arise in the course of this litigation. Thus, it is unlikely that conflicting decisions will be rendered.

Referral to the FMC also seems inappropriate in light of the history of this litigation and the possibility of delay. Defendants have filed several agreements providing for inter–conference rate–making, all of which were withdrawn before the FMC took binding action. Unlike in *Carnation*, where the investigation had been underway for three years at the time the law suit was filed, here the FMC investigation did not commence until after many of these actions were filed. Moreover, the scope of the FMC investigation appears to be far broader and more oriented to the future than would be necessary to resolve the issues

---

**6.** Plaintiffs urge that the FMC's disapproval of the Bridge Agreement is a determination by the FMC. Although it appears that, on the basis of the record before it, the FMC viewed the proposed activities as outside the scope of approved agreements, the order of disapproval was subsequently vacated. Consequently, this determination is without precedential value.

*Boston Community Media Committee v. FCC*, 509 F.2d 516 (D.C.Cir.1975). Similarly, the defendants' nolo contendere pleas in the criminal cases involving the same set of circumstances may not be relied on as evidence in a subsequent civil action. 15 U.S.C. § 16(a); *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976).

relevant to this case. We also note that the FMC has been denied access to the grand jury proceedings in the criminal cases brought against the defendants on the ground that the materials were not sought preliminarily to or in connection with a judicial proceeding. *U.S.A. and F.M.C. v. Atlantic Container Line, Ltd.,* (D.C. Nos. 79–1931 and 79–2162) April 18, 1980. The FMC has indicated that these documents would be valuable in conducting its investigation and that such a denial will result in further delay. In the event that the grand jury proceedings become necessary or useful in expediting determination of this case, the court, unlike the FMC, may direct disclosure in connection with this proceeding, pursuant to Rule 6(e)(2)(C)(i), F.R.Cr.P. In light of these considerations, the interests of justice will not be served by the further delay caused by referral to the FMC.

Finally, as in *Litton Systems, Inc. v. A.T. & T., supra,* plaintiffs' request for a jury trial raises the possibility that reliance on the FMC's findings may present substantial Seventh Amendment problems. *Id.* at 960.

In sum, after considering the justifications for invoking the doctrine of primary jurisdiction in light of the facts and circumstances of this case, we conclude that referral of this action to the FMC is not appropriate. *See Litton Systems Inc. v. A.T. & T., id., Sunoco Energy Development Co. v. Burlington Northern Inc.,* 483 F.Supp. 119 (D.Wyo.1980). Accordingly, defendants' motion is denied in all respects.

SO ORDERED.